TITLE GUARANTEE AND TRUST COMPANY, Appellant, *v.* MAX
PAM, Respondent.

First Department, June 4, 1920.

**Bills and notes — action against maker of promissory notes given
as payment for work to be performed by payee — agreement that
payee shall render monthly accounts as work progressed — failure
of payee properly to perform — negotiation of notes to trust
company having knowledge of equities between maker and payee
— control of affairs of payee by banking institution — identity
of officers of payee and bank discounting notes — when holder
only entitled to recover reasonable value of work performed by
payee — when bank discounting note not holder in due course —
admissibility of evidence as to agreement under which notes
given.**

Action brought by a title guaranty and trust company as plaintiff to recover
the amount of two promissory notes made by the defendant and dis-
counted by the plaintiff for the payee, the defense being, first, that the
plaintiff had been paid the amount of the notes by the payee which is
still the owner thereof so that the action is not prosecuted by or in the
name of the real party in interest, but only for the purpose of depriving
the defendant of his second partial defense, to wit, that the notes were
given in consideration of the agreement of the payee to do certain work
for the defendant for a compensation measured by the cost of the work
plus five per cent thereof, in payment whereof the defendant had executed
and delivered said promissory notes believing that monthly statements
of cost rendered by the payee were true, while as a matter of fact said
statements were untrue and the work was unskillfully, negligently and
wastefully performed by the payee, its agents and servants, and that
the statements rendered were made with an intent to deceive and defraud
the defendant, and that the plaintiff at the time the notes were indorsed
to it had knowledge of said facts and the claims of the defendant against
the payee in respect to the transactions alleged. It appeared from the
evidence that the payee agreed to do certain construction work for the
defendant in a foreign State and in consideration thereof the defendant
was to give his promissory notes as alleged, and it was further shown
that the agent of the payee in charge of the construction work failed
properly to perform the same; that the bills rendered for the work done
were greatly in excess of the estimated cost and included sums expended
by said agent for his personal entertainment, etc. It was further estab-
lished that the relationship between the plaintiff trust company and the
payee was more intimate than the ordinary relationship of banker and
depositor, and that the plaintiff in the past had done much to finance
the payee, and that there existed a voting trust agreement by which

the plaintiff named a majority of the board of directors and finance committee of the payee, and thus in fact had control of the payee at the time of the trial of the action; that officers of the plaintiff were also officers of the payee, the financial affairs of which were regularly reported to the plaintiff which received and filed copies of all correspondence of the payee, and that the plaintiff regularly audited the accounts of the payee and had knowledge of the monthly progress of the work done by it. On all the evidence,

*Held,* that the plaintiff trust company was chargeable with knowledge and notice that the defendant's notes were not given as evidence of an indebtedness for a fixed amount, but were given with the distinct understanding that the amount was to be fixed after an investigation as to the *bona fides* of the bills rendered to the defendant by the payee, and hence that the notes which in fact were renewal notes were subject to all the defenses and claims available to the defendant against the payee, and that said knowledge was possessed by the plaintiff at the time it discounted the notes in suit, so that it is only entitled to recover on the notes the reasonable cost of the work properly performed by the payee, together with the five per cent compensation agreed upon with an additional percentage for overhead charges.

Under the circumstances, the plaintiff is not entitled to recover the face value of the notes, not being a holder in due course.

It was proper to permit the defendant to prove the actual agreement under which the notes in suit were given and that a condition was attached to their delivery, as this is not a case of the unconditional delivery of a note, with a claimed condition subsequent.

LAUGHLIN, J., dissented, with opinion.

APPEAL by the plaintiff, Title Guarantee and Trust Company, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 22d day of November, 1915, upon the decision of the court rendered after a trial at the New York Trial Term, a jury having been waived.

*Charles E. Hughes* of counsel [*Allen S. Hubbard* with him on the brief], *Harold Swain,* attorney, for the appellant.

*Edmund L. Mooney* of counsel [*Francis S. Bangs* and *Frederick A. Card* with him on the brief], *Guthrie, Bangs & Van Sinderen,* attorneys, for the respondent.

DOWLING, J.:

This action was brought to recover the amount of two promissory notes each made by defendant to the order of the Thompson-Starrett Company, bearing date November 1, 1912,

payable·in one year after date, with interest, one note being in the amount of $96,733.52, the other $3,094.63. The complaint sets forth that the notes, in consideration of the face amount thereof and the accrued interest were duly indorsed and delivered by the Thompson-Starrett Company to the plaintiff on December 7, 1912, and that on November 3, 1913, said notes were duly presented for payment and payment demanded and refused, whereupon the notes were duly protested.

The amended answer denies knowledge or information sufficient to form a belief as to whether plaintiff is the owner and holder of the notes in suit or either of them, and also as to whether the notes have been paid or the whole amount thereof remains due. There is then set up as a first separate defense:

" III. On information and belief that before the commencement of this action the notes, interest and protest fees mentioned in the amended complaint were paid unto the plaintiff by the Thompson-Starrett Company, the payee in said notes named and the alleged endorser thereof, and that thereupon said last named company became, thereafter continued to be and still is the owner and holder of said notes and each of them, and that this action was not brought, nor is it being prosecuted, by or in the name of the real party in interest, to wit, said Thompson-Starrett Company as plaintiff; but was brought and is being prosecuted by and in the name of the plaintiff above specified, in the interest of said Thompson-Starrett Company, and for the purpose, if possible, of unjustly depriving this defendant of the benefit of his partial defense to said notes hereinafter set forth."

The answer then sets up as a second and partial defense the following allegations:

" IV. That on or about August 17, 1911, the defendant and the Thompson-Starrett Company, the payee of the notes alleged in the amended complaint, entered into an agreement in writing whereby it was agreed that said Thompson-Starrett Company should execute certain work for the defendant at Uva, in the State of Wyoming; that the compensation of said Company should be on the basis of the cost of said work plus five per cent. of such cost; that monthly statements should be rendered by said Company to the defendant, showing the cost of the work

at the end of each month, to which should be added said five per cent. commission, and that in payment therefor the defendant should give to said Company his promissory notes with interest at six per cent. per annum.

" V. That said Thompson-Starrett Company entered upon the performance of said agreement and from time to time rendered to the defendant statements of cost, representing the same to be correct; that relying upon such representations and believing the same to be true, the defendant made and delivered to said Thompson-Starrett Company his certain promissory notes as said statements of cost were rendered to him, and duly performed all the conditions of said agreement on his part to be performed; that on account of said notes defendant paid to said Thompson-Starrett Company the sum of twenty-four thousand six hundred forty-six dollars and ninety-two cents ($24,646.92); that on November 1, 1912, the amount of said notes outstanding was ninety-six thousand seven hundred thirty-three dollars and fifty-two cents ($96,733.52).

" VI. Upon information and belief, that in the performance of said agreement said Thompson-Starrett Company was unskillful, negligent and wasteful and unreasonably and improperly delayed the work undertaken by it, thereby largely and improperly increasing the cost of such work, and said statements of cost were false and fraudulent in that they contained charges for the purchase of unnecessary and useless supplies and materials, for work and labor done and supplies and materials purchased at excessive rates, for expenditures not belonging to the work and for expenditures made in consequence of the unskillfulness, negligence and unreasonable delay on the part of said Company, its agents, servants and employees, in the performance of said agreement, such charges having been made by the agents and servants of said Company employed on said work knowingly and with intent to deceive and defraud the defendant.

" VII. That the matters alleged in paragraph VI of this amended answer were unknown to the defendant at the time when he received said statements of cost and gave his notes therefor; that on the subsequent discovery of the matters in said paragraph alleged the defendant communicated the same to said Company, and thereafter, on November 1, 1912, on

the maturity of said notes then outstanding and in renewal thereof, defendant made and delivered to said Thompson-Starrett Company his note for ninety-six thousand seven hundred and thirty-three dollars and fifty-two cents ($96,733.52) set forth in the amended complaint, together with his further note for three thousand and ninety-four dollars and sixty-three cents ($3,094.63) also set forth in said amended complaint, the amount of the note last mentioned representing the amount shown in the statement of cost rendered to the defendant by said Thompson-Starrett Company for the month of July, 1912; and that the defendant expressly reserved to himself all rights and claims against said notes alleged in the amended complaint, in connection with the performance of said agreement on the part of said Company.

" VIII. Upon information and belief that the plaintiff, before said Thompson-Starrett Company endorsed and delivered to it the notes alleged in the amended complaint and before paying for the same, had knowledge of the claims of the defendant against said Thompson-Starrett Company in respect of said notes and the transactions hereinbefore alleged and of the reservation by the defendant of his rights and claims against said notes."

The decision of the learned trial court has found the following facts: Plaintiff is a domestic corporation, engaged among other things in the banking business and at the times in question was the banker of the Thompson-Starrett Company.

On or about August 17, 1911, the defendant and the Thompson-Starrett Company, the payee of the notes alleged in the amended complaint, entered into an agreement whereby it was agreed that the Thompson-Starrett Company should execute certain work for the defendant at Uva, in the State of Wyoming; that the compensation of said company should be on the basis of the cost of said work plus five per cent of such cost; that monthly statements should be rendered by said company to the defendant, showing the cost of the work at the end of each month, to which should be added said five per cent commission, and that in payment therefor the defendant should give to said company his promissory notes bearing interest at six per cent per annum. This work consisted of the construction of dams, ditches, dikes and other matters,

connected with an irrigation project at Uva, conducted by the North Laramie Land Company, whereof defendant owned or controlled all the stocks and bonds. This company owned the land upon which the work was being done. The plant already installed had proved to be inadequate, and the contract was for its alteration and enlargement. The Thompson-Starrett Company entered on the performance of its agreement and from time to time rendered to defendant statements of cost representing the same to be true, and relying upon such representations and believing them to be true, defendant made and delivered to the Thompson-Starrett Company his promissory notes after the statements were rendered to him, the notes in suit representing the balance claimed to be due.

On May 1, 1912, in place of notes maturing on that day, amounting to $70,992.91, the defendant paid to the Thompson-Starrett Company $22,225.10 and gave to the said company his note for $50,000 maturing November 1, 1912, said payment representing $20,992.91 on account of principal and $1,232.19 as interest on all of said notes maturing May 1, 1912, all subject to all defenses and claims against the same.

Said payment of $22,225.10 was made, and said note for $50,000 maturing November 1, 1912, was given, upon the representation that the statements of cost rendered to the defendant by the Thompson-Starrett Company were correct and upon the agreement that an investigation into the cost of the work would be made; that if anything was wrong it would be corrected and an adjustment made, and that for the work remaining to be done notes should be given maturing November 1, 1912. Further, pursuant to said agreement, the defendant made and delivered to the Thompson-Starrett Company his three additional promissory notes maturing November 1, 1912, aggregating $49,828.11. The payment made on May 1, 1912, of interest in the amount of $1,232.19 was an overpayment of interest to the extent of $352.04, subject to all defenses and claims against the same.

The contract between the Thompson-Starrett Company and defendant provided that the former should accept as payment for its expenditures and commission on said work the promissory notes of the latter, bearing interest, which defendant

promised and agreed to execute and deliver to the company each and every month for the amount of the expenditures and commission of the company for the preceding month. The Thompson-Starrett Company delivered monthly to defendant vouchers aggregating $115,715.79, and defendant executed and delivered to the Thompson-Starrett Company his promissory notes in the initial gross total sum of $121,501.56, excepting an amount of $680.52 for which no note has been given or payment made. The court has found that the payments made by the Thompson-Starrett Company were evidenced by receipted vouchers showing payment by it and duly rendered and delivered. The smaller in amount of the notes in suit was given by it to defendant monthly during the continuance of the work in payment of expenditures on the work shown by the vouchers delivered by the Thompson-Starrett Company to defendant on July 31, 1912, with the commission thereon.

On November 1, 1912, the defendant made and delivered to the Thompson-Starrett Company the promissory notes in suit under an agreement with that company that such were made and delivered subject to all rights, claims and defenses of defendant and without prejudice or waiver of any rights and claims defendant might have against said notes on any account in connection with the agreement above mentioned, such being expressly reserved by defendant.

The notes in suit were given, not as evidence of an indebtedness of a fixed amount, but were given with the distinct understanding that the amount was to be fixed after an investigation into the *bona fides* of the bills rendered and were subject to all the defenses and claims against the notes.

On November 1, 1912, defendant, by another of his notes for $2,421.82 maturing and paid on May 2, 1913, made a payment of $2,350.15 as interest on his notes maturing on November 1, 1912. Said payment was an overpayment of interest on the amount payable by him on that date to the extent of $1,248.48, subject to all defenses and claims against the same.

On December 7, 1912, the Thompson-Starrett Company maintained four accounts in plaintiff's bank subject to check. These accounts were known as "Plain," "Special No. 2," "Pay Roll" and "Pipeshop." On that day, December 7,

1912, the plaintiff discounted the notes in suit and credited the Thompson-Starrett account in its bank with the net sum of $100,015.52, being the amount of the notes less discount; and on December 16, 1912, plaintiff is found to have become the holder of the notes for value. The court further found, in relation to this transaction, as follows:

. The only value given for the notes sued on was a credit to the deposit account of the Thompson-Starrett Company on the books of the banking department of the plaintiff; and at no time between the date of discount and the 19th day of December, 1912, were the moneys in such account to the credit of the Thompson-Starrett Company used, withdrawn or reduced below the sum of $42,609.39.

The said notes were discounted by the plaintiff on the 7th day of December, 1912, and the proceeds credited to the deposit account of the Thompson-Starrett Company. Between that date and December 19, 1912, the amount of moneys withdrawn from the said account amounted to the sum of $153,578.04.

There were deposits between the 7th day of December, 1912, and December 19, 1912, exclusive of the amount of said discount, amounting to the sum of $89,130.72.

The balance to the credit of said deposit account at the close of business on the 19th day of December, 1912, amounted to $45,152.94.

The court has found that defendant duly performed all the conditions of the agreement between him and the Thompson-Starrett Company on his part to be performed, but that in its performance of said agreement the Thompson-Starrett Company was unskillful, negligent and wasteful; that it unreasonably and improperly delayed the work undertaken by it, and that its acts largely and improperly increased the cost of the work. Further, that the statements of cost rendered by the Thompson-Starrett Company under the agreement were false and fraudulent in that they contained charges for expenditures not belonging to the work and for moneys dishonestly appropriated by its agents, servants and employees, as well as for expenditures made in consequence of the unskillfulness, gross negligence and waste on the part of said company, its agents, servants and employees in the performance of said agreement.

These improper charges were unknown to defendant when he received the statements of cost and gave his notes for the sums represented therein. It is further found that before the Thompson-Starrett Company indorsed and delivered to plaintiff the notes referred to in the amended complaint, it had notice of the facts set forth in the amended answer; and that before the Thompson-Starrett Company indorsed and delivered to plaintiff the notes referred to in the amended complaint, it had notice of the reservation by defendant of his rights and claims against said notes, as set forth in said answer.

Plaintiff, before paying for the notes set forth in the amended complaint, also had notice of the reservation by the defendant of his rights and claims against said notes, as set forth in the answer, and before the plaintiff had paid the full amount agreed to be paid for the said notes on the discount thereof, it had notice as well of defendant's rights, claims and defenses, as set forth in said answer.

Before the plaintiff had paid the full amount agreed to be paid for the said notes on the discount thereof, it had notice of such facts as were sufficient to put it upon inquiry with respect to the rights, claims and defenses set forth in the amended answer, and if inquiry had been made the plaintiff would have ascertained the rights, claims and defenses set forth in said answer.

At the time the notes in suit were negotiated to the plaintiff it had notice that the title of the Thompson-Starrett Company, who negotiated them, was defective; and such title was in fact defective and, therefore, the court held that plaintiff had failed to sustain the burden of proving that it acquired title thereto as a holder in due course. The court also held that the Thompson-Starrett Company negotiated the notes in suit in breach of faith and the negotiation thereof was a fraud on the rights of the defendant. Further, that the amount due plaintiff from defendant under the agreement has not heretofore been liquidated; that the reasonable cost of the work performed and materials furnished by the Thompson-Starrett Company, together with ten per cent for plant and overhead charges, together with the five per cent of such cost as compensation to the Thompson-Starrett Company, is $72,644.95. Plaintiff paid $20,992.91 of this amount to the

Thompson-Starrett Company on May 1, 1912, leaving a balance due of $51,652.04. The amount of overpayments of interest made by defendant to the Thompson-Starrett Company, with interest thereon to November 1, 1913, is $1,696.26. On November 1, 1913, defendant was indebted to the Thompson-Starrett Company in the sum of $53,150.64, being said sum of $51,652.04, together with interest thereon from November 1, 1912, to November 1, 1913, less said sum of $1,600.52.

On May 2, 1913, defendant paid to the Thompson-Starrett Company the sum of $2,421.82, being in payment of a note representing interest upon the notes theretofore given by defendant to Thompson-Starrett Company in connection with the said agreement; such payment was made pursuant to an agreement that the same was made without prejudice or waiver of any rights or claims that defendant might have against the notes then held by the Thompson-Starrett Company on any account in connection with the agreement above mentioned, such being expressly reserved by defendant.

The court has found as to the two corporations, plaintiff and the Thompson-Starrett Company, that neither is a subsidiary of the other, nor is there any substantial identity between them. The Thompson-Starrett Company is capitalized for $2,000,000, divided into 15,000 shares of common and 5,000 shares of preferred stock, all of the par value of $100 per share. On November 3, 1913, the said promissory notes were duly presented for payment to the maker and payment thereof was demanded and refused and said notes were then and there duly protested. The cost of said protest fees was $2.54, which sum was a proper charge therefor. No part of the principal, interest or protest fees has been paid.

The court has found as conclusions of law:

1. The plaintiff did not take the said notes in good faith.

2. There was a partial failure of consideration for said notes, which is a defense *pro tanto* to said notes.

3. The plaintiff is not entitled to recover upon the notes set forth in the complaint, but only for the reasonable cost of the work done under the agreement made between the defendant and the Thompson-Starrett Company under date of August 17, 1911, plus five per cent.

4. The plaintiff is not entitled to recover interest.

First Department, June, 1920.    [Vol. 192.

5. The title of the Thompson-Starrett Company to the notes in suit was defective.

6. The plaintiff is not a holder of the notes in suit in due course, and is only entitled to recover the amount which was actually due the Thompson-Starrett Company.

Judgment was directed in favor of plaintiff in the sum of $53,150.64, with costs.

There is a sharp conflict of testimony as to many important points in the case, but the learned trial court, with the opportunity of observing the demeanor of the witnesses, resolved the disputed questions of fact in favor of defendant, and in its opinion referred to the frequent contradictions in their own statements made by plaintiff's principal witnesses; their truculency under cross-examination; their unwarranted attacks on defendant; the refusal to allow an examination by defendant's counsel of the books and vouchers connected with the work done, even after the legal adviser of the Thompson-Starrett Company had consented thereto, and the efforts to hinder the taking of depositions of witnesses for the defense. The court further said: " In contrast, the testimony of the defendant was given in a straightforward manner, and was consistent with and corroborated by the contemporaneous letters and documents.

" Where, therefore, his testimony conflicts with the witnesses for the plaintiff, I unhesitatingly accept his testimony. The plaintiff not only has failed to establish by a fair preponderance of the evidence that it was a holder of the notes in due course, but the defendant has established facts tending to prove the contrary."   (155 N. Y. Supp. 333, 343.)

Defendant's testimony shows that he is an attorney at law of over thirty years' standing, admitted to practice in the State of Illinois and in the United States courts, with offices in Chicago and New York.   His time is spent about equally between those two cities.   He has large business interests and is general counsel for various important corporations, of many of which he is a director.   Prior to the transactions involved in this suit, he had business relations with the Thompson-Starrett Company in the erection of the Insurance Exchange Building at Chicago, valued at some millions of dollars and of which he and E. R. Graham of Chicago were equal owners.

This building was in course of construction in August, 1911, and on the tenth or eleventh of that month, in New York city, defendant met Louis J. Horowitz, president of the Thompson-Starrett Company. Defendant thus narrates the conversation between them: " I told Mr. Horowitz that I had talked to Mr. Graham about the project that I was interested in in Wyoming; that it needed completion, and asked him to indicate who would be a proper person or proper concern to undertake that work. He suggested that I take it up with Mr. Horowitz of the Thompson-Starrett Company. Mr. Horowitz said to me that Mr. Graham had already discussed — had already talked to him about it, and that he had told Mr. Graham that he would be very glad of the opportunity to show his appreciation of what I had done for the Thompson-Starrett Company to undertake this work for me. I told him that I had a large investment there, that I had acquired bonds to the amount of about $150,000, that I had put in further money in connection with the project, and that it was not entirely completed, that I understood not very much was required to be done, that it all could probably be finished by the end of September, and I should like to know whether they were in position to undertake it, whether they would. He said that — ' yes, I will be very glad to do it. As I told Mr. Graham, I want to show my appreciation for what you have done for us, and we are perfectly equipped to undertake the work; we have an office in Salt Lake City; we have a representative there, Mr. Morton, who is specially qualified to look after it, and we would be very glad to do the work at cost plus five per cent commission.' I told him that I was not familiar with the details as to just how much was to be done, but that Mr. O'Neill through whom I was interested in this situation and who had agreed when I bought these bonds that they should be taken off my hands at a slight profit within a given time, would know more about it, and I would like to know when Mr. Horowitz could take the matter up with Mr. O'Neill in Chicago and discuss the details with him. Mr. Horowitz said he was going to Chicago in a few days. I told him I would arrange for an appointment for him with Mr. O'Neill in Mr. Graham's office in Chicago, which I accordingly did; " and further: " I told him [Horowitz] that I was anxious to realize upon this investment, that the autumn

months was [*sic*] the period when property of this kind could be sold, and I understood there was not more than enough required to be done, as I said before, beyond September. I was very anxious to get it done properly, and wanted to know if he could do the work at once, whether they were in position to do so, and also wanted to be sure that it was done at the lowest possible cost. He said, ' Mr. Pam, you can rely on our doing it at minimum cost. It shall be done as speedily as anybody can do it. Mr. Morton, as I say, is well qualified if he will give it his personal attention.' * * * He [Horowitz] said ordinarily they would not be interested in the job because it was too small, but because of the things I had done for them they would undertake it upon the terms stated."

It was stated that payment was to be made by defendant's notes, payable May 1, 1912, with interest at six per cent upon statements to be furnished by the Thompson-Starrett Company as to the cost each month. On August seventeenth Horowitz called at defendant's office in Chicago, and said he had seen O'Neill and gotten from him a pretty fair idea of what the work was and that he thought it ought to be finished within thirty days or thereabouts, but he could not tell because he had not received enough details, whereupon defendant suggested a meeting upon the work itself between O'Neill, Whiting, the engineer on the job, and Morton, the representative and manager of the Thompson-Starrett Company at Salt Lake City. Horowitz said he would telegraph Morton promptly. Defendant suggested putting their arrangement in the form of a written communication, to which Horowitz replied: " Certainly, we are quite prepared to go ahead with it now, and if you will dictate a letter embodying the terms and the suggestions that we have agreed upon, it will be satisfactory." Defendant thereupon dictated the following letter in Horowitz's presence, who said it was satisfactory and asked that it be sent over to his office, when he would return an acceptance thereof:

" CHICAGO, ILL., *August* 17, 1911.

" THOMPSON-STARRETT COMPANY,

"51 Wall Street, New York:

" GENTLEMEN.— I am sending you herewith drawings and general specifications for reinforced concrete facings to be

constructed on the North Laramie Land Co.'s project near Uva, Wyoming.

" I desire you to put yourselves into communication with Mr. J. A. Whiting, Engineer, Cheyenne, Wyoming, who will give you any additional necessary information and instructions you may require for the purpose of executing this work.

" I herewith employ you to execute such work as Mr. Whiting may direct you in writing to execute, upon the understanding that I will pay you for this work on the basis of cost to you plus five (5%) per cent. of the cost for your profit.

" I agree that your cost is to include expenses of every nature incurred by you, including railroad transportation, board bills, and wages of people employed entirely or in part in connection with this work.

" You are to render to me monthly statements showing the cost to you of the work at the end of each month. To this cost you will add the 5% commission above referred to. Against such bills I will give you my promissory notes with interest at the rate of six (6%) per annum, maturing May 1st, 1912.

"As soon as practicable for you to do so, I will be glad to have from you an approximate estimate as to the total probable cost of the work ordered up to any one time, such estimate of course to be in no way binding upon you.

" Yours very truly,<br>" MAX PAM."

To this the following reply was sent:

" THOMPSON-STARRETT COMPANY,<br>" Building Construction,<br>" Fisher Building, Chicago.

" *August* 17, 1911.

" Mr. MAX PAM, The Rookery, Chicago:

" DEAR SIR.— Your letter of August 17th received.

" In pursuance with the directions therein contained, we will proceed with the work under the terms enumerated in your letter under reply.

" Yours very truly,<br>" THOMPSON-STARRETT COMPANY,<br>" L. J. HOROWITZ, *President.*"

First Department, June, 1920.        [Vol. 192.

Defendant thereupon prepared a letter of instruction to the engineer at the work, Whiting, and sent a draft thereof to Horowitz. To this the latter replied, as follows:

" Thompson-Starrett Company,
        " Building Construction,
        " Fisher Building, Chicago.

" Mr. Max Pam,                          "*August* 17, 1911.
        " The Rookery, Chicago:
" Dear Sir.— We notice that your letter to Mr. Whiting calls upon him to approve our monthly vouchers for work done. In as much as this approval is not provided for in our agreement, I would suggest that you write Mr. Whiting a letter advising him that such approval is unnecessary.
                " Yours very truly,
                        " L. J. HOROWITZ,
                                " *President.*"

In view of what subsequently transpired, and the way in which defendant's interests were treated by the Thompson-Starrett Company, it is very significant that the provision thus objected to by Horowitz was as follows: " Vouchers are to be presented by the contractor from time to time which you are to examine and approve as engineer." Defendant upon receipt of this letter called up Horowitz and as the result of their conversation withdrew this instruction, which if agreed to by Horowitz, would have furnished defendant with adequate protection against fraud, mistake or overcharge during the progress of the work. Defendant testified as follows: " I called him up and said to him, ' Why is it, Mr. Horowitz, that you want me to strike out of my letter of instructions to Mr. Whiting the provision that he should pass upon it and approve all vouchers and expenditures.' I said, ' That would be the one means I would have of keeping track, in a way, of the cost and the expenditures.' He said, ' I make that suggestion in your interest. We don't know Mr. Whiting, we know him as an engineer, we don't know what kind of experience he has, and engineers are usually technical and captious, and it would interfere and delay your work, it would very seriously interfere with our efficiency.' ' Well,' I said, ' That is all right, but I

want to get some idea of the cost as we go along.' ' Well,' he said, ' Mr. Pam, you know we are taking this job with the idea of rendering you the best possible service. You can rely upon me that no expenditure will be made excepting that it is necessary, and the expenditures and the cost will be kept down to a minimum. Indeed, we will deal with this job as though we were doing it for ourselves. Mr. Morton will look after it carefully and give it his personal attention.' I said, ' Very well, Mr. Horowitz, I am going into this thing with you, this arrangement, and I will put myself in your hands, and will modify my letters of instructions to Mr. Whiting, and therefore eliminate all question of his having to approve the vouchers and the expenditures.' And I accordingly modified the letter and excluded that part of it which Mr. Horowitz asked me to."

The letter, with the provision in question omitted, was sent to Whiting and is dated August 17, 1911. Among other things it advised Whiting that the Thompson-Starrett Company was undertaking the work largely because of its friendship for defendant; he had absolute faith in the integrity of the contractor, and for that reason he was taking no estimates. He also instructed the engineer that his purpose was that the work should be completed so that it could be properly certified by Whiting as engineer and be approved by any engineer who might want to look at it at the instance of any proposed purchaser, and that while defendant purposed to pay cost to secure completion of the project, he did not want to spend money unnecessarily, and, therefore, would like the project completed substantially but as economically as conditions permitted.

Morton, manager of the Thompson-Starrett Company at Salt Lake City, wrote Horowitz, as its president, a letter dated August 30, 1911, a copy of which the latter transmitted to defendant under date of September fifth, in which Morton said that he had made a careful examination of the Laramie project on the ground with O'Neill (secretary of the irrigation company) and Whiting, its engineer, and had reached the opinion that the work already done was badly done and the whole proposition showed lack of foresight and poor management. He gave a detailed description of the project and the work already done upon it, discussed future operations to complete it, and said he had just finished a preliminary esti-

mate for the purpose of ordering the necessary materials, and while the estimate was not intended to be accurate in any way as to final quantities, it was close enough to give an approxi-mate idea as to what the work would cost.  He described the work covered by the order to the Thompson-Starrett Com-pany and said: "All of the above is subject to such omissions or additions as may be found advisable when the work is under way, but, assuming that no great changes will be ordered, the probabilities are that the cost of this work will run somewhere in the neighborhood of $30,000."  To this letter Horowitz replied as follows:

" THOMPSON-STARRETT COMPANY,
            " Building Construction
     " Office of            51 Wall Street
" L. J. Horowitz                 NEW YORK, *Sept.* 5, 1911.
     " President
" Mr. L. J. MORTON,
     " c/o Thompson-Starrett Company
                " Salt Lake City, Utah:
" DEAR MORTON.—        LARAMIE PROJECT

" Your letter of August 31st enclosing the report in duplicate received.  This is exactly what I wanted.

" Please bear in mind that Mr. Pam has in mind an expend-iture of about $30,000.00, and, while our contract with them makes them liable for any expenditure we make, so long as it is authorized by the engineers, still I would not like to go ahead with any project involving the expenditure of much more money than the amount named, without first calling his attention to it.         Very truly yours,
                        " L. J. HOROWITZ,
" L J H — S2 — 4                         *President.*"

The Thompson-Starrett Company forwarded to defendant on October 25, 1911, a detailed " list of vouchers " showing the expenditures for the months of August and September, amounting to $172.62 and $8,208.86, respectively.  On Novem-ber ninth the company wrote from its New York office to defendant at his Chicago office, requesting that he send it a note payable May 1, 1912, for the amount of these two state-ments, " as we have spent considerable money on this operation

to date." On November tenth the company sent a further itemized statement for $14,059.13, covering the October outlay. Defendant made and delivered his two notes for the aggregate of these three months, dated November seventeenth.

Meantime Morton had telegraphed Horowitz under date of September twenty-fifth that the Uva job would take three months more to finish and upon this being called to defendant's attention he reminded Horowitz that it was understood the work should be finished in the autumn, and in November he asked Horowitz to find out the condition of the work and the time and expense still involved. In December defendant asked Horowitz for a definite estimate of the cost of the work, and received a letter from him inclosing a letter sent to him by Morton, under date of December 13, 1911, stating that the work had been held back greatly by unfavorable weather for the preceding six weeks, winter having set in earlier than at any time during the last twelve years; that the cost of work since November had been higher because of the weather; that Whiting was afraid to have any more concrete work done till about March first, but wished team work continued throughout the winter; that additional work had been ordered by Whiting, and that he had reminded the latter that his (Morton's) approximate estimates submitted to defendant had shown that the cost of the work as ordered would run about $38,500, while the work then included and the extra expense incurred by working in bad weather would make the job cost something over $60,000. Morton gave the then condition of the work and concluded: "All of the remaining ditch work will be finished up during the winter so that when spring opens we will have only to do the concrete work on No. 1 dyke and No. 3 dam to have the whole project entirely completed." Morton signed his letters as manager of the Thompson-Starrett Company.

On January 17, 1912, the following letter was sent by the Thompson-Starrett Company to defendant:

"NEW YORK, *January* 17, 1912.

" Mr. MAX PAM,

" The Rookery,

" Chicago, Ill.:        UVA JOB.

" DEAR MR. PAM.— You have now in your possession statements showing expenditures made by us amounting to between

$29,000 and $30,000, a large part of which represents expenditures made about two months ago.

" I dislike very much to bother you, but our need for money, together with the criticism of our Auditing Committee, are responsible for my imposing on your good nature.

"About two weeks ago you told me that in a few days thereafter you would check up our account and send us a note.

" May I suggest that you give us your note for the amount of our statements with the understanding that if before we render a further statement you find any errors in checking up the account, such errors shall be corrected in connection with the following payment.

" What I suggest is that you give us your note for $29,000. We will get the money, and you can take your time to do the checking without inconveniencing us by depriving us of the use of the money we have already laid out.

" You will understand, of course, that I am not asking you to do any more than it has been agreed should be done, but I would not even ask for that if it were not for the necessities of the situation.     Yours truly,

" L. J. HOROWITZ,

" LJH–WH–2.                                                     *President.*"

In New York city about January 22, 1912, defendant called up Horowitz on the telephone and told him that: " I had received that letter, that I had not given him the note for December which was received subsequent to the time for November, because the two items together aggregating nearly $30,000, had already run within a very few thousand dollars of the entire financial estimate made by Mr. Morton of $60,000, and I was dissatisfied and was worried about these increasing costs, and I wanted to know from him what it meant. I wanted to get some explanation. I wanted some assurances, and he said, ' Mr. Pam, I have told you that your job is receiving Mr. Morton's personal attention, you can rely upon the fact that Mr. Morton is giving it every possible attention towards getting the cost down, and if what is said is not true it would not be so.' ' Well,' I said, ' Mr. Horowitz, there is some way of limiting this cost.' He said, ' In my judgment this cost is entirely due to the weather, as Mr. Morton reports, you

can rely upon the integrity, upon the correctness of the representations; and if the cost exceeded $60,000, it would be very small, if anything.' I said, ' Mr. Horowitz, I will send you over those notes,' and I gave him the note of January 24th * * * for $29,956.18."

Under this new and modified arrangement, neither defendant nor his engineers had any cost data or material to work from. Defendant testified: " I had these records, these vouchers contained a supposed labor sheet and supposed vouchers, receipted vouchers, of things that they had sent on. I knew nothing about any of the matters stated in any of those statements or vouchers, and all I could do was to rely upon their representations that those were the costs, and I simply checked up in this; there was an addition made of the items with totals, to see that the figures agreed, that was all." He had no means of testing or checking up either the necessity or honesty of the expenditures, or whether the work had actually been done upon the job.

The next conversation between Horowitz and defendant took place in the former's office in Chicago in March, 1912. Defendant was then negotiating for the sale of the entire Uva project, and said to Horowitz that the last information he had about the progress of the work was in a letter from Morton about December thirteenth, wherein it was stated that the work would be finished about April first and as the representative of the proposed buyer was waiting to look it over before a final decision, he (defendant) wanted to be sure when the work would be finished. He told Horowitz that he was offered certain improved real estate in Chicago in exchange for the project and Horowitz volunteered to, and did in fact, examine these properties and strongly advised defendant to close the deal. Defendant told Horowitz he wanted to make sure the work was finished, so the proposed purchaser could examine it, and added: " Besides, Mr. Horowitz, I have just signed another note which already exceeds the final estimate upon the work as generally understood by everybody by over $10,000, and it is imperative that I be relieved of this burden, that I put myself entirely in your hands, and I have been relying upon what you have assured me would be the minimum cost of this project." He said, " I shall instantly telegraph Mr. Morton.

I feel confident that that property must be ready for inspection."

The Thompson-Starrett Company's statement to defendant for November, 1911, called for $16,486.69 and for December for $13,469.49. Defendant gave his note for the aggregate, dated January 24, 1912, payable May first.

On March 15, 1912, defendant gave the company his note for $14,781.93, payable May. first, for the statements of expenditures rendered him by the Thompson-Starrett Company for the months of January and February.

There had been telegrams between Horowitz and his company's manager about the condition of the work and then defendant telegraphed direct to Morton as follows:

" Thompson-Starrett Co.
"Salt Lake Office
" Received 1 p. m.
" April 9, 1912.

" Chicago apr. 8–12.                                    (141)

" L. J. Morton.

" Thompson-Starrett Co. Salt Lake, Utah:

" I have relied upon the assurances of Mr. Horowitz that the work at Uva would be done as economically and expeditiously as possible. The cost thus far is many times the estimate made and is appalling and still the work is not completed, the water is rising, the reservoirs and ditches are not ready. I was assured and felt that it was unnecessary for me to have a personal representative on the ground to assure economy and speed. I was hopeful with the approach of spring I could do something with the situation, and now that there is offered to me a favorable proposition for the sale of the whole project am unable to meet it. I want to know now definitely when the work will be completed and the water turned in.

" MAX PAM."

Morton replied as follows:

" Salt Lake City, Utah, *April* 9, 1912.
" Max Pam,
" The Rookery,
" Chicago, Illinois:

" Completion of work at Uva depends largely on weather. We will probably turn water into first and second reservoirs

before April thirtieth. Work on third reservoir and other work ordered will require over two months. We have handled job as economically and expeditiously as possible but have been badly handicapped by unfavorable weather during last five months. Our estimate covered only work ordered at the start and was based on the expectation of fairly decent weather. A large amount of very expensive additional work has been ordered from time to time and the cost of all work has been increased by reason of bad weather.

                                            " L. J. MORTON."

Morton sent the telegram and a copy of his reply to Horowitz at the New York office of the Thompson-Starrett Company.

On April tenth the company sent a statement to defendant of the expenditures for March amounting to $3,814.19.

Horowitz on April fifteenth sent to defendant a letter received by the former from the manager at Salt Lake City, Morton, in which the latter said that while the cost of the work had been increased by extremely bad weather, the real reason why the total cost on the job was running to such a large figure was that Whiting, the engineer, had found it necessary to do over practically all of the existing ditch work, besides putting in new ditches and none of this work was contemplated when the estimate of $30,000 was made; moreover, additional work had been ordered and Whiting, he claimed, had expressed no dissatisfaction with the way the work was handled.

Defendant, however, who had lost the sale of his project, was not satisfied with the explanation given for the delay and the constantly increasing cost. On April twenty-ninth defendant and Horowitz met at the former's Chicago office and he thus describes the interview: " Mr. Horowitz came to the office. I called his attention to the fact that the amount of the cost up to that time had very considerably exceeded the $60,000. I also said to him that the job not having been finished, I had lost the opportunity of realizing, because the Cudahys would wait no longer for the completion of the job had gone elsewhere and bought — and contracted for another piece of property, that the notes were coming due, that I had given on May 1st, and that I objected to the payment of those

notes in view of the excessive cost and because of the delay which had been encountered and indulged in by these men; that the first assurance I had was that job would be finished in the early autumn. The next statement was that it would be finished in January; that my first estimate was $30,000, which was finally increased — which was subsequently increased to $38,500; that it was later, in December, I received a final estimate for the work as it was completed to be $60,000; that I had relied implicitly upon his assurance that the work would be done expeditiously, that the work would be kept down — the cost would be kept down to a minimum, and that Mr. Morton would give it attention and that I need not have anybody on the ground. I said I had reached the point where I was unwilling to pay these notes without some investigation on my own account with reference to the correctness of the situation. He said that what he would like to have me do — ' You know,' he said, ' You probably exaggerate your ideas of inattention. I am confident that Mr. Morton has given it every possible attention, and that the cost is no more than it should be; that the increase was due largely to the weather conditions and to the additional work ordered by the engineer.' I told him that I had no information on that subject except their continuous statement to me in their correspondence of that fact, that before making any payments I wanted to have some knowledge upon the subject and I wanted to write Mr. Whiting and get some information. He said that — he said, ' I suggest that you pay down this amount of notes to $50,000, and renew the $50,000 until November 1st, and in the meantime you can make whatever investigation and inquiry you care to, so as to satisfy yourself that what we have said to you — what I have said to you continuously is correct.' I said, ' Mr. Horowitz, what about the balance, is there any assurance, is there any indication what I am to meet there? ' He said, ' Let whatever balance there is, let that — make your notes payable November 1st, so that in the meantime the work will be completed, and then if there is anything wrong it will be corrected.' He said, 'As I wrote you a few days ago, referring to the letter of April 15th, I am absolutely sure that this work cost you infinitely less by our doing it than if anybody else had done it.' I said, ' Well, I am willing to do that; I am will-

ing to pay you down to $50,000, and then in the meantime I will give you these notes, but there must be some adjustment between now and November 1st and find out exactly what is right.' He said, ' That is perfectly satisfactory to me. I will find out what the amount is so that we can figure it out.' "

On the next day Mr. Horowitz, in Chicago, telephoned the defendant that he had learned from his office in New York the amount of the notes and the interest up to May 1, 1912, and that it was $72,225.10, and stated that the defendant should send over in accordance with the arrangement made the day before a check for $22,225.10 and his note of $50,000 payable November first, which the defendant did, accompanied by the following letter:

" THE ROOKERY, CHICAGO, *April* 30, 1912.
" Mr. L. J. HOROWITZ, President,
   " Thompson-Starrett Company,
        " Chicago, Illinois:
" DEAR MR. HOROWITZ.— In accordance with your conversation over the telephone, I herewith hand you check for $22,225.10 and note for $50,000 payable on or before six months from May 1st, 1912, account my notes and obligations held by you in re North Laramie Land Company.

" Please return to my office in New York, notes which you now hold.

                    " Yours very truly,
" Enclosures.                    MAX PAM."

Whiting had criticized the conduct of the work in a telegram to defendant dated May seventeenth, and when a copy thereof was sent by defendant to Horowitz, he replied that in his opinion Whiting was unjustified in his criticism, that he was trying to throw the blame off his shoulders because he had made too low an estimate and that as the company had taken the work as an accommodation to defendant, it would not be displeased if he followed Whiting's suggestion and take the work out of the company's hands, putting it entirely under his supervision.

On May 13, 1912, defendant was furnished by the Thompson-Starrett Company with a statement of expenditures for the month of April amounting to $11,583.48.

Telegrams passed between the Thompson-Starrett Company and Whiting in April, and Morton, the former's manager, and its superintendent at Wheatland, Wyoming, H. J. Jennings, in relation to the opportunity which defendant had of disposing of the project and the telegram from the company to Jennings was as follows:

" SALT LAKE CITY, UTAH, *April* 22, 1912.
" To H. L. JENNINGS, Superintendent,
     " Thompson-Starrett Company, Wheatland, Wyoming:
" Mr. Whiting advises us that it is necessary to have all work completed as quickly as possible. If you can secure a larger force and can use same to any advantage in completing the work earlier, do so at once and advise us.

" L. J. MORTON."

On June 3, 1912, Whiting wrote to defendant complaining of the dilatoriness of the company and specified various details of carelessness or incompetency in the doing of the work. He also said: " The Thompson-Starrett Company are excellent contractors on city work but their methods of handling your project is too raw and mostly due to the selection of a totally unfit man for the position of superintendent." A copy of this letter was sent to Horowitz, who sent same to the Thompson-Starrett Company, Manager Morton, with this letter:

"(On letterhead of:)          THOMPSON-STARRETT CO.
                              " NEW YORK, *June* 10, 1912.
" Mr. L. J. MORTON, Manager,
     " Thompson-Starrett Company,
          " 361 Main Street, Salt Lake City:
" MY DEAR MORTON.—          UVA JOB
" Mr. Max Pam sends me this copy of a letter received by him from Mr. Whiting, following a statement by him to me that things in Uva are so bad as to bear investigation. He charges not only extravagance, but has reason to believe that there has been some dishonesty on the part of the people in charge at Uva.
" I do not know just how closely you kept in touch with this matter to be able to make up my opinion as to whether there is any ground for Pam's charges, or whether Mr. Whiting

is making statements which have no basis of fact.  At any rate, the matter is serious, and I would like to have a full and complete report from you on the subject.

                              " Yours truly,
                              " L. J. HOROWITZ,
                                             " *President.*"

On June 13, 1912, the engineer, Whiting, wrote to O'Neill, through whom defendant became interested in the Uva project, setting forth in detail various reasons why the job had cost far in excess of the estimate.  This letter was communicated by defendant to Horowitz, and a copy thereof forwarded by him to Morton and it was the subject of discussion between Horowitz and defendant.  In this letter Whiting admits that the cost of the work was excessive.  He states 'that: " The Salt Lake Branch of the Thompson-Starrett Company when they began construction of the project secured the services of a man for Superintendent whom they did not know other than his letters showed he had performed some work for them at some other branch.  This man is directly under the Salt Lake Office.  However the Manager does not visit the work very often and the Superintendent has his own way most of the time.  While I am able to make them put in the proper work I have no authority to discharge this Superintendent or any of his men.  I can suggest and demand better efficiency but cannot force them to do so.  In fact I am ignored most of the time as regards suggestions.  I have frequently taken the matter of doing the work at a less cost with both Mr. Morton and the Superintendent with but little success.

" The Superintendent is on the work only a small part of the time.  When he is he pays little attention to it with the results that there is a shortage in some particular material or special men most of the time.  If the concrete force is large and able to handle much material there is a shortage of sand or gravel or cement.  If the materials are abundant the force of men is insufficient.  I might cite the case of putting a furniture maker as a foreman over earth excavation.  When I objected to this and called the Supert. attention to the small amount of material being moved for the money was informed that his results were the best they had been able to receive.  For the

past two months the Superintendent has been learning to run an automobile that Mr. Pam's money bought. Can I discharge this man or make him do different? I should say not. Does the Salt Lake City Office discharge him and put a new Supt. in his place? No. Every attempt is being made to discredit our work to cover up this additional expenditure. I have reason to believe that booze, joy-rides, etc., are charged to Mr. Pam."

He narrates two incidents of alleged extravagant conduct on the part of the superintendent.

On June 25, 1912, Horowitz wrote to Morton, the manager of his company at Salt Lake City, and in his letter said he had received from defendant a copy of this Whiting letter and inclosed a copy of it to Morton. Horowitz said he had gone over his files and gotten out the letters he wrote to Morton when he turned over this work to him and that he had then tried to impress on Morton the following:

"A. That we were under many obligations to Mr. Pam, and for that reason it was most important to conduct this operation so as to furnish no good cause for criticism.

" B. That I wanted you to carry on the job in such a way as to discharge, in part, the many obligations we are under to Mr. Pam.

" C. That I represented to Mr. Pam you were well qualified to produce the very best results from the standpoint of economy, quality of work, and time of completion.

" D. If it appeared to you, at any time, that the work was going to cost more than Mr. Pam expected, or would take longer than the time allowed, you were to notify me promptly, with a view of my taking the matter up with Mr. Pam, and keeping him fully advised.

" E. To avoid the work suffering through lack of attention, or lack of ability on the part of the Engineer in charge, I asked that you advise me if you had any criticism to offer.

" F. If you experienced any delay that would adversely affect the work, I asked you to let me know so that such situation might be remedied.

" G. That you cultivate Mr. Whiting with a view of promoting the harmonious and efficient conduct of the work.

" In other words, I tried to cover the situation from every

standpoint to insure a satisfactory result. You can imagine my disappointment, therefore, in having handed to me the letter, a copy of which is herewith enclosed.

" The letter would indicate that you have fallen down in one or more of the matters I cautioned you against. What I am after now is to get at the exact facts of the situation. If what Mr. Whiting says is true, the Company can be charged with being either careless, incapable, or dishonest, or any two or all of these."

He then reminded Morton that he had written him some weeks before and asked for a full report, but it had not been received; that he wanted Morton to make a full and thorough report, to approach the matter with an open mind that the facts might be ascertained, and that if he, Horowitz, could not get them in any other way, he would go to Salt Lake City himself and made an investigation on the ground. He proceeds:

" If the cost of this work bears one dollar of money that might have been saved through proper attention on the part of this company, or its representatives, I want to be told frankly of this fact, so that we may return money improperly spent to Mr. Pam, because we can far better afford to lose money than to betray the confidence of our clients.

" Specifically Mr. Whiting charges as follows:

" A. That the Superintendent on the job is incompetent.

" B. That the Superintendent on the job is careless.

" C. That the Superintendent on the job is extravagant.

" D. That you have not visited the work as often as you should have for proper supervision.

" E. That the Superintendent on the job is more concerned in enjoying himself, and joyriding, than he is in properly supervising the work.

" F. That all of the above has resulted in an excessive cost."

Horowitz had received this letter of Whiting's from defendant at an interview in the latter's office about June twenty-second. Defendant said: " ' Mr. Horowitz, here is a letter that I want you to take. If confirms what I have said to you heretofore, that this job is being recklessly and dishonestly conducted. I called your attention to these conditions, and apparently it has had no effect. You have constantly assured me that

First Department, June, 1920.    [Vol. 192.

Mr. Morton was giving this job attention, and that I need not worry about it, that you were confident that my feeling of inattention was exaggerated; ' but he said ' I will take this matter up with Mr. Morton promptly, I will write him definitely and find out just what the facts are.' And on the 25th I received from him a letter in which he enclosed a copy of the letters he wrote to Mr. Morton under that date. I told him in that interview that I had not kept any — made any effort with reference to the different complaints towards personal correction because I had had his repeated assurances that the matter was receiving attention. I called his attention to Mr. Whiting's statement in the letter that Whiting had tried to convey to me things, and that when I had .mentioned the letter to Mr. Horowitz, Mr. Horowitz persistently insisted that I could depend upon their exercising the best of attention, and that they were carrying out their arrangement with me as their assurances that they were giving the job attention."

Morton replied to Horowitz under date of June twenty-eighth, saying that Whiting had never expressed dissatisfaction with the superintendent; that he had asked on two occasions that certain things be done and his requests were complied with to the best of their ability, and in general disavowing knowledge of the basis for the complaints made by Whiting. He concludes: " In concluding, I wish to say that I have absolutely nothing to reproach myself with in connection with this job, although I realize fully that I will be blamed for whatever dissatisfaction may exist as the result of it. I believe that the same result would have been achieved had the job been handled by anyone else in the company's employ, and, since it seems to be a case where somebody had to be the goat, I suppose it might just as well be me as anybody else."

This letter of Morton's was communicated to defendant, by Horowitz in a letter in which he says: " As far as this letter goes it bears out my suspicions in the matter.

" Please advise what next you would like to have me do in the matter."

In a conversation between them thereafter defendant advised Horowitz that he had sent all the vouchers to Whiting with instructions to prosecute the fullest investigation.

On July 23, 1912, Horowitz wrote to defendant and in the

course of the letter said: " My attention has been called to the fact that there is due from you $35,150.04, representing $17,739.50 for expenditures made by us during the month of May, 1912, and $17,410.54 for expenditures we made in June, 1912.

" As we have laid out this amount of money I am being criticised for not collecting same, and I would ask you to kindly send us at once either your check or note to cover this amount, and oblige."

Concerning this letter a conversation took place in New York between defendant and Horowitz. Defendant testified: " I said to Mr. Horowitz that I was not disposed to give any more notes on this job; that since talking with him before I had learned from Mr. Hurd, who had seen Mr. Whiting, that Mr. Morton had not been on that job between December and the end of May; that I had been assured by Mr. Morton — by Mr. Horowitz that Mr. Morton would give his attention to the job, and in some of the correspondence that he would be there every week or two weeks or three weeks; that in the light of the letter I had received from Mr. Whiting and the light of the correspondence that had passed between us that the facts and the conditions were such that I did not feel that I ought to give any further notes, but the matter should now remain for adjustment between us when the proper investigation was made as I had suggested to him in April when I gave the May 1st note. Mr. Horowitz said that his finance committee was criticising him for not getting these notes for expenditures that had been made for a month or two months, and no notes received. I told him that I withheld giving notes because of what had become almost a concrete. state of facts. He said, ' It is not necessary to withhold the notes. My understanding with you is that the matter shall be investigated and adjusted and it will save me adverse criticism if you will give me the notes.' I said ' Very well, I will do so,' and I sent him over the notes dated August 2, 1912."

In September, 1912, a meeting took place at the Blackstone Hotel in Chicago. Defendant testified: " I told Mr. Horowitz that I wanted to discuss the entire   *   *   *   situation with relation to the investigation and with relation to the notes that

were coming due on the first of November. I told him I wanted to take it up thus early because I expected to be very much occupied between then and the first of November in matters entirely separated from business or from the office. I told him what it was. And I said to him that the opportunity for making the necessary investigation had not been sufficient to get any kind of results. He said he appreciated that, and that the men had scattered a great deal and it was necessary, of course, to get in touch with the various people who were around the job. I said to him that as it was I was unwilling to pay — make any payments on those notes until after the subject had been entirely and fully investigated and every effort made to reach what was an adjustment based upon the results of the investigation. He asked what I suggested ought to be done. I told him sufficient opportunity in the way of time should be given to get the information in all directions, that the charges were serious, and that he ought to be just as much interested in having an investigation complete and satisfactory as I, and he said, ' You are quite right about that; I am very anxious that there should be a proper investigation. I want you to be satisfied that you have not been imposed upon, and I want you to be satisfied that the complaints that have been made to you by Mr. Whiting have been grossly exaggerated.' He said, ' What do you suggest with reference to the time,— what do you suggest doing? ' I said, ' It seems to me the notes ought to be renewed for a sufficient length of time to permit the investigation and the adjustment after the investigation has been completed.' He said, ' The matter of your contract and your claims and your complaints have been the subject of discussions in the Finance Committee, and they have charged me with showing favoritism to you by reason of my (meaning his) friendship for me [you] (meaning me),' but that he had insisted that the renewal of the notes which he had agreed to would be made so that the investigation could be conducted. I told him that I thought the renewal ought to be for a year so that abundant opportunity could be had, that the autumn was on, it was impossible to locate the people, and it would take probably six months or more to have the investigation completed, and then sufficient time ought to be afforded for

adjustment after getting the result of the investigation. He said he would have a difficult time persuading his Finance Committee to allow that extension, that renewal, but that so far as he was concerned, he felt that I ought to have every opportunity for the investigation and to satisfy myself with reference to the facts, and that he would renew the notes for one year. * * * Q. When he spoke of the renewal of the notes for the year, as you have stated, tell us whether anything was said on the subject of any adjustment as the result of the investigation or any claims or defenses? A. Yes. When the matter of the — when he said that he would agree to the renewal, I said, ' Of course, Mr. Horowitz, you must understand that these various complaints and claims I have made and whatever defenses I have to these notes are reserved so that they can be the subject of adjustment when the renewal period is up.' And I said to him, or he said,— I think we both said to each other that all expedition should be used to get this investigation as quickly as possible, so that abundant time was left for adjustment."

Horowitz was unexpectedly obliged to go to Europe on account of his health. An adjustment was made with him of certain notes in relation to the Insurance Exchange matter. In the course of this settlement, which took place on October 2, 1912, defendant said to Horowitz: " Have you disposed of the renewal of the Uva notes or notes in the Uva matter during your absence? He said, ' Yes, but I had a devil of a time getting it through my Finance Committee. They — as I told you, they insisted that I was altogether too friendly in giving you the renewal, but that I insisted to them that you should have whatever time was necessary to make a complete investigation and reach an adjustment,' and he said that they finally agreed to it. He said, ' What about the interest?' So I said, ' Well, Mr. Horowitz, what will you do with reference to the notes on November 1st, if you are going to be away?' He said, ' I will give instructions to Mr. Pond to exchange the existing notes for the renewal notes on the 1st of November.' Then he said, ' How about the interest?' ' Well,' I said, ' Mr. Horowitz, it will be practically impossible to pay the interest because the amount of the notes is not ascertained, the amount that is to be payable on these notes is not ascer-

First Department, June, 1920.          [Vol. 192.

tained. We cannot fix the amounts until the adjustment is reached. Therefore, there can be no interest paid at this time but,' I said ' I will give you a note payable on demand which can be adjusted at the same time that the principal is taken up for final adjustment.' " The witness sent the notes, which are the notes in suit, excepting the interest notes.

Defendant's notes, now in suit, were given by him pursuant to the agreement with Horowitz, while the latter was in Europe. They went into the possession of the Thompson-Starrett Company until December 7, 1912, when they were discounted by plaintiff, which credited the account of the company with $100,015.53 therefor and the latter checked out the amount thereof prior to December 16, 1912.

On May 1, 1913, defendant testified that this occurred: " Mr. Horowitz called me up on the telephone in New York and asked me to send them a. check for the interest note which they held. I asked him why I should send a check for the interest note any differently from the other notes which were under the same arrangement. He said that he was subjected to embarrassment by his people, that they were insisting that the interest should be paid. I said to him the agreement was that the interest note was to be adjusted with the other notes. He said, ' Yes, but it is a demand note, and they insist upon being paid, and it subjects me to embarrassment.' ' Well,' I said, ' Mr. Horowitz, I don't want to embarrass you; if it is going to relieve you of embarrassment, I am perfectly willing to pay the note but it must be upon the — payment must be made exactly with the same understanding under which the notes were given, that whatever defenses and claims I have against the notes shall be reserved.' He said, ' Of course, that is understood.' "

On May 2, 1913, defendant sent the following letter:

" 2001 Empire Building,
"New York, *May* 2, 1913.

" Dear Mr. Horowitz.— Herewith find check for $2,421.82, being in payment of note representing interest upon notes heretofore given you by me in connection with the contract for work, labor, and material upon the North Laramie Land project.

" This payment is made as agreed between us over the

telephone this morning, without prejudice or waiver of any rights or claims that I may have against the notes now held by you on any account in connection with the contract above mentioned, such being expressly reserved.

" Please acknowledge receipt and oblige,

" Yours very truly,

" L. J. HOROWITZ, Esq.,                              MAX  PAM.

     " Prest., Thompson-Starrett Co.,

                    " New  York  City."

To this letter Horowitz replied as follows:

          " THOMPSON-STARRETT Co.,

                    " NEW YORK, *May* 5, 1913.

" Mr. MAX PAM, 2001 Empire Building,

     " New York City:          UVA JOB.

" DEAR MR. PAM.— I acknowledge receipt of your letter of May 2, and in reply state as follows:

" I understand you are under the impression that some of our employees charged with the execution of your work at Uva have been guilty of dishonest practices in connection with the expenditures made there.

" As stated to you whenever you discussed this subject with me, I do not believe that there is any foundation of fact in such assumption, but if it were proven that there was any misapplication of funds by any of the employees of this Company, then in that event, and to the extent of such defalcation, this Company and not you, would be loser.

" I would ask that you gather your facts together and submit them to me as quickly as possible, so that this matter may be promptly disposed of. The longer this matter is delayed, the more difficult it may be for us to disprove any of the allegations which your engineers may make, because there is no telling how long the people who are familiar with the facts may remain in our employ, and therefore be available for furnishing such explanations as may. be proper to make.

" You speak of having rights or claims against the notes held by us. While these notes have been 'discounted by us, so that no claim can be said to exist against them, I want to assure you that if it develops that your suspicions were well founded, this Company will give you its check, and reimburse

First Department, June, 1920.     [Vol. 192.

you for any damage you may have suffered, without regard to the fact that the notes are no longer in our possession.

" In the meantime I want you to bear in mind that we took this work to accommodate you. We did not represent ourselves as experts in building dams. You found it necessary to have someone do this work, lay out the money and accept notes in payment, and because of business relations between you and this Company in other directions, I concluded to accommodate you.

" I am pointing this out so as to make it clear that any charge by you, even if it were proven that the work was done in any incompetent or extravagant manner, would not, under the circumstances, be considered a valid reason for this Company losing any money.

" As far as I have been able to learn, the cost of the work is no greater than it should be, bearing in mind the conditions under which it had to be done, and following plans and specifications furnished us by your engineers.

" Yours truly,<br>" L. J. HOROWITZ,<br>" *President.*"

To this last letter defendant sent the following reply:

" Pam & Hurd, The Rookery, Chicago.<br>" *May* 10, 1913.

" Mr. L. J. Horowitz,

    " President, Thompson-Starrett Company,

       " 51 Wall Street, New York City:

" Dear Mr. Horowitz.— Your letter of the 5th instant, addressed to me to New York was forwarded to me here, and I hasten to reply.

" That there may be no misunderstanding as to my position relating to the Uva job, I desire to correct the impression that my only complaint and contention rest upon the claim that the employees of your company charged with the execution of the work have been guilty of dishonest practices in connection with the expenditures made there. I also want to correct the impression, as stated by you later in the letter, to the effect that you would not be held accountable even if it were proven that the work was done in an incompetent or extravagant manner.

" As I have said to you, I have had the matter investigated by the Engineer and by others, and a report has been submitted, and it is my purpose immediately the pressure upon me is released to carefully examine this report and place you in possession of the facts and information that have come to me upon the subject.

" I want, however, at this time to correct your mis-impressions by again stating, what I have heretofore stated, that it is not only claimed that expenditures have been made dishonestly in connection with this work, but that the work has been done incompetently and expenditures made so recklessly and so extravagantly and the management of the job conducted so unreasonably and so improperly as to clearly constitute a fraud on the part of those of your men and employees in charge of the work and performing it, and in this connection you will remember that repeatedly and continuously did I complain to you of the extravagant expenditures and the delay occasioned in the completion of this work. Let me direct your attention to the fact that the estimated cost of this job made by your Mr. Morton was $30,000, and the amount of bills rendered aggregated something over $120,000; more than four times your estimate, which it seems to me cannot be accounted for upon any basis excepting such as has been contended for.

" I write you thus fully to avoid misunderstanding when the matter of adjustment is taken up, and to enable you to advise yourself fully and gather all the information that you can for use in connection with the matter.

" Yours very truly,
" MAX PAM."

This elicited from Horowitz the following response:

" *May* 14, 1913.

" Mr. MAX PAM,
      " The Rookery,
            " Chicago:            UVA JOB

" DEAR MR. PAM.— Your letter of May 10, just received.

" As suggested in the last paragraph of your letter, I am asking Mr. Morton to gather the necessary information which I am sure will correct many of your misapprehensions.

In the meantime I want to repeat what I have told you on several occasions, namely: that it is my opinion that your Engineer's exaggerated statements are made to probably excuse his own mistakes.

" I recall your speaking to me on several occasions about the work running high, and I also recall my replying that there had been a lot of work added from time to time to that originally contemplated. You have probably in the pressure of business forgotten many of these instances, but, fortunately, many of them were made the subject of correspondence, and I have no doubt when these are brought to your attention you will be relieved to learn that in the main your fears are unfounded.

" You build your entire argument around the statement that the work cost four times as much as originally contemplated.

" The principal reasons responsible for the final cost of the work are:

" (1) Enlargement of the scope of the work as originally intended.

" (2) Some accidents and washouts which were unavoidable, and for which we were in no way responsible.

" (3) The actual cost of the work under the conditions it had to be done exceeding our estimates, for which also we assumed no responsibility.

" Please let me have the report you speak of as soon as possible, so that I may reply to it in detail, and get this matter, which must be as unpleasant to you as it is to me, behind us.                    Yours truly,

" L. J. HOROWITZ,
" *President.*"

Defendant had received a report from Whiting giving the result of his investigation, undertaken at defendant's request. Horowitz had written to defendant on May 19, May 27 and June 4, 1913; the last two letters in a somewhat facetious vein, calling for the engineer's report. On June fourteenth defendant wrote Horowitz that he had finished reading Whiting's report and would deliver it to him the following week. Among other things he wrote: " In view of the con-

fidence which you have entertained and expressed in the organization doing your Company's work at Uva and in the light of your attitude towards the situation raised by me, which you have treated almost with ridicule, I cannot refrain from saying that I never have seen or read a statement or report of such reckless and unconscionable mismanagement and abuse as appears in this report. Indeed, from your own report as submitted to the engineer there is an apparent misappropriation wholly unaccounted for. I am confident when you have read this report, you will concur in this conclusion."

To this Horowitz replied on June sixteenth, and his letter contained this paragraph: " I do not want you to think that I have treated this matter lightly. Any dissatisfaction on the part of any of our clients is always a matter of very serious importance to me, and with you I would be apt to take it more seriously than with the average client because of our past friendly relations, etc.

" I still think that you have been misled by your Engineer, and feel confident that when I get the report I will be able to shoot it full of holes, and satisfy you that there is nothing in the charges made against the work done by us."

The report of Whiting was delivered by defendant to Horowitz about June 19, 1913, at New York city and on the same day Horowitz wrote to Morton as follows:

" (On letterhead of:)     THOMPSON-STARRETT COMPANY,
                    " NEW YORK, *June* 19, 1913.
" MR. L. J. MORTON, Manager,
          " Thompson-Starrett Co.,
              " Insurance Exchange, Chicago:
                  " UVA JOB.

" My DEAR MORTON.— I have received the report from Mr. Pam on the above. The report is made up by Mr. Whiting, the Engineer, and if the conclusions which Mr. Whiting reaches are correct, this Company would stand to lose some forty or fifty thousand dollars.

" I think it would be well for you to come on to New York, bringing with you such data and information as you have gathered on the subject, following my request some weeks

ago. I want to thoroughly go over this matter with you so that I may make up my mind as to what portion, if any, of the charges made by Mr. Whiting are true, and to what extent, if any, credit should be made to Mr. Pam because of the existence of alleged abuses. I wish you would arrange to be here not later than Monday or Tuesday of next week.

" Yours truly,

" L. J. HOROWITZ,

" *President.*"

On July twenty-second Horowitz sent to defendant a copy of Morton's report made in response to the foregoing letter, in which the latter reported that Whiting had failed to sustain any of his charges, and with this conclusion Horowitz agreed. To this defendant replied, stating that no explanation had been made why extra work amounting to $49,000 was claimed to have been done on a job estimated to cost $30,000; that nearly $40,000 of the total expense was unaccounted for; that the statement that it was a " rush job " was no reply to specific charges of unreasonable delay, gross extravagance, and unjustifiable expenses. To this Horowitz replied on July 28, 1913:

" I have read your letter of July 25th. I do not think anything is to be accomplished by any further correspondence between you and us. It is perfectly obvious to me that you have made up your mind that the thing is wrong without regard to the facts in the matter.

" Our position is that the charges made by your engineer have not been sustained. I am commencing to feel that he did not get these up in good faith. Be that as it may, we believe that your affairs were handled as well as possible under the circumstances, and now request that you send us a check for $680.50 being the balance due us on this account, and oblige."

Some months elapsed without further action. Defendant then sent to Horowitz the following letter:

" 2001 EMPIRE BUILDING,

" NEW YORK, *October* 27, 1913.

" MR. HOROWITZ.— I received notice this morning of the maturity of my notes from the Title Guarantee & Trust

Company. Of course I assumed in view of the negotiations pending in this matter that these notes would be renewed pending the conclusions of these negotiations. I am willing, if agreeable to you, to pay interest accrued and make a new note for the aggregate of the two notes for such time as we may agree is proper, with the understanding, of course, that the making of this note by me is not a recognition of the amount of the obligation represented thereby, nor a waiver by me of any defenses thereto. The matter of interest also to be adjusted at the conclusion of the negotiations to whatever would have been payable upon any reduced amount may be agreed upon as the result of such negotiations. With that in view, I will leave with Miss Morley, before my departure for Chicago, note covering the principal of the two notes, and upon the delivery thereof together with check covering interest in accordance with this letter, please have returned to Miss Morley the maturing notes.

" Sincerely yours,

"MAX PAM.

" L. J. HOROWITZ, Esq.,
    " Prest., Thompson-Starrett Co.,
" New York City."

To this Horowitz replied as follows:

" <i>October 28th,</i> 1913.

" MR. MAX PAM,
    " 71 Broadway,
        " New York City:           UVA JOB.

" DEAR MR. PAM.— We cannot agree to the arrangement proposed in your letter of October 27th, 1913, to take care of your notes held by the Title Guarantee and Trust Company.

" The amount of money involved in the various charges made by your representative is, at best, but a very small proportion of the amount of these notes, and cannot be used as a reason for not paying them when due, or to affect their integrity.

" I am perfectly ready to discuss the report with you any time that suits your convenience, either before or after the due date of the notes.     Yours truly,

" L. J. HOROWITZ,

"<i>President.</i>"

Defendant then wrote to Horowitz under date of October 30, 1913, detailing at length his grievances against the Thompson-Starrett Company in relation to their work upon the project. He stated that the amount of vouchers submitted as representing cost aggregated $120,000, of which .$26,000 had been paid and the rest was represented by notes; that Whiting's analysis of the vouchers showed that the total cost should in no way have exceeded $76,000, giving credit for every doubtful item, though as a matter of fact the reasonable cost would not have exceeded $56,000; that the difference involved was almost $50,000, more than half the amount of the notes; and that the statement of Meredith, the Thompson-Starrett Company's assistant manager (such statement being in the company's possession), was that the amount which defendant should have paid or become liable for, was but slightly in excess of the original estimate of $30,000. He further charges that the company has statements showing the recklessness, extravagance and incompetence of its representatives on the job; that it knew that Jennings, its superintendent on the job, was neglectful, reckless, incompetent and absented himself more than half the time; that its own commissary man had told it that the commissary department instead of losing $8,000 upon the small job should have made money, and that the difference upon that department alone between the way in which it was conducted and the manner in which it should have been run was $1,000 a month, representing a total of over $12,000. He refers to the fact that Horowitz has received all the statements from the sheriff, merchants, workmen and others to show the recklessness and extravagance of the operation and that the Thompson-Starrett Company's representative, Jennings, and the others had conducted the work without regard to reasonable cost, proper management or defendant's interest, " but with every deliberate purpose and accomplishment in extravagance and recklessness to the point of a loss to me in my judgment of not less than $60,000 or $70,000." He continues: " Now, it was understood that I was to be treated fairly; it was understood that I was to pay only the cost and that means a reasonable and honest cost; it was understood that I was to have proper management and proper

supervision. Instead of that the reverse has been visited upon me. A dishonest, indecent, irresponsible, reckless superintendent, whose greatest boast according to the statement of Mr. Smith was ' his operation of a large house of prostitution in California,' is put in charge, leaving behind him a trail of orgy and debauchery in connection with this work that no reputable concern like yours can afford to sustain and in the arbitrary manner that you are now seeking to sustain it, namely, to force a payment of these notes in the face of the facts disclosed, and without any answer thereto excepting the conclusions of Mr. Morton, whose failure to give the job proper attention, in my judgment, had considerable to do with the result."

He concludes: " Never in your experience, nor in mine, has there been such conclusive and complete unanimity of opinion and proof to sustain the fact that this work was not given proper attention; that this work did not have the proper supervision; that your Company did not have the proper superintendent, and I have been made to suffer immeasurably thereby. Not alone, Mr. Horowitz, by an excess cost of perhaps $70,000 or $80,000, but by a loss to me which may be of several hundred thousand dollars, due to the unnecessary and unwarranted delay in finishing this project, and making it impossible for me to utilize or realize on it before this period of depression set in.

" You can well understand under these circumstances how surprised I was and how disappointed I am to see the attitude taken by you in your letter of the 28th, and intimating, too, that I am seeking to avoid payment of notes by a specious claim for reduction of a small amount.

" It is my desire to take this matter up with you just as soon as I come East again, and if possible to reach an amicable, fair adjustment, and then deal with the notes in the light of that adjustment. If we are unable to agree, then if it is possible find some other method of reaching a conclusion without litigation, I am perfectly willing to try, but surely claims of such substantial character and of such large amounts as have been proven to you by the statements submitted by me cannot go unconsidered."

Nothing further was done to meet defendant's objections

First Department, June, 1920.          [Vol. 192.

or criticisms, or to prove the honesty and fairness of the vouchers submitted. The notes went to protest on November 3, 1913, and this action was begun December 11, 1913.

It appears from the testimony that the instructions to bring this suit were given by plaintiff's president after a discussion in the finance committee of the Thompson-Starrett Company at which the members expressed the wish that plaintiff should bring the action against the defendant rather than the company. The relationship between the plaintiff and the Thompson-Starrett Company was far more intimate than the ordinary relationship of banker and depositor. As far back as 1903 the Thompson-Starrett Company was in need of more capital and was reorganized as a means of securing new interests with additional capital. It came to the plaintiff as a trust company and requested it to undertake to find the additional capital for it, and for a fee the plaintiff undertook to do so and obtained many of its friends to subscribe to the new stock and strengthen the company. These subscriptions amounted to $650,000. The prior capital had amounted to $1,000,000, of which a good deal had then been absorbed or lost. One of the conditions under which the plaintiff undertook to secure this additional capital was that control of the Thompson-Starrett Company should be given to the plaintiff. There was a voting-trust agreement and the plaintiff named a majority of the board of directors and a majority of the finance committee of the Thompson-Starrett Company. This control continued through the means of printed proxies sent out annually through the office of the Thompson-Starrett Company and the proxies remained the same — two representing the interests of the plaintiff and one that of the original Thompson-Starrett Company stockholders. The control of the Thompson-Starrett Company by a majority of the board of directors and a majority of the finance committee remained with the plaintiff down to the time of the trial of this action. During the time of the transactions in question three of the members of the finance committee of the Thompson-Starrett Company were Clarence H. Kelsey, president of plaintiff, E. O. Stanley, its vice-president, and E. T. Bedford, one of its directors. Stanley was the head of the plaintiff's banking department and it

was important for him to know the affairs of the Thompson-Starrett Company as a large customer of and possible borrower from the plaintiff. The meetings of the finance committee of the company were occasionally held in one of the rooms of plaintiff. Those meetings took place every two weeks and plaintiff's president presided thereat as chairman. General discussions took place thereat where all proposed contracts of the company about to be entered into were discussed and authorized. All the correspondence which the president of the Thompson-Starrett Company conducted at its New York office went into his file there and carbon copies were made therefrom. All correspondence of the president outside of New York was copied and carbon copies sent to the New York office, finally finding a place in the general files of the company. Not only was the plaintiff's president the president of the finance committee of the Thompson-Starrett Company, but plaintiff's vice-president, Stanley, its loan officer, was chairman of the auditing committee (consisting of two members) of the Thompson-Starrett Company. This involved the examination of the securities of the latter company and the auditing of its various accounts and books by the auditing department. That committee also saw certain statements showing the progress of jobs and each month received a trial balance giving a statement of the securities, assets and liabilities of the company, with a statement of contracts showing each job undertaken, the amount to be paid, the terms of payment and the nature of the payment, and thereafter each month the progress of the work, the payments due and how payable. Without detailing the numerous items of testimony which demonstrate the close and intimate connection in a business way between the plaintiff and the Thompson-Starrett Company, it conclusively appears that the plaintiff not only had the fullest opportunity for knowledge of the details of the business transacted by the Thompson-Starrett Company and its relations with the parties with whom it had contracts, but that in fact such knowledge was obtained in the fullest and most complete measure by its own officers, whom plaintiff had put for that very purpose upon the directorate and committees of the Thompson-Starrett Company. It is difficult to see how one corporation

largely interested in the financial success of another corporation, whose affairs it in effect dominated, could have taken more effective means for obtaining full, complete and intimate knowledge of all the business transactions of the corporation in whose welfare it was interested, both because it had secured capital for the second corporation and because it was its banker and loaning it money as well. This record shows conclusively the vigilance with which the plaintiff's interests were guarded in the Thompson-Starrett Company and demonstrates the possession of a knowledge directly chargeable to plaintiff of the affairs of the Thompson-Starrett Company gained by plaintiff's officers selected and nominated for the very purpose of obtaining such information for plaintiff's knowledge and guidance. The testimony demonstrates that the plaintiff is chargeable with notice of the general conduct of the business of the Thompson-Starrett Company, which came to the cognizance of the committees upon which plaintiff was so well represented. In particular it is chargeable with knowledge of the existence, prosecution and details of the contract between the Thompson-Starrett Company and defendant, including knowledge and notice of defendant's claims that he did not owe the amount represented by the notes given by him; and as well with notice that the notes given in suit were not original notes, but were renewal notes, given to take up other notes previously given by defendant to the Thompson-Starrett Company under the agreement between them. It is chargeable with knowledge and notice that the notes were not given as evidence of an indebtedness of a fixed amount, but were given with the distinct understanding that the amount was to be fixed after an investigation as to the *bona fides* of the bills rendered and that they were subject to all the defenses and claims against the notes; that they were given subject to all the rights, claims and defenses of the defendant and without prejudice or waiver of any rights and claims the defendant might have against the said notes on any account in connection with the agreement between defendant and the company, such rights and claims being expressly reserved by the defendant. And this knowledge the plaintiff had when it discounted the notes in suit for the Thompson-Starrett Company.

The testimony herein is quite convincing that the Thompson-Starrett Company acted in breach of faith in negotiating the notes in question; that its title thereto was defective; that plaintiff had notice of this defect; that plaintiff acted in bad faith in discounting the notes and is not a holder in due course.   The testimony sustains the findings of the trial court to the foregoing effect, and fully justifies the conclusion reached by it.   The Thompson-Starrett Company obtained the notes in suit upon the distinct and explicit agreement that they were not to be taken as evidence of any fixed indebtedness owing by defendant, but that the amount thereof was to be subject to future and final adjustment, after an investigation of the honesty of the bills rendered.   These notes were never intended to be certain and definite in amount. Undoubtedly there had been friction in the finance committee of the Thompson-Starrett Company because Horowitz had not been getting notes from defendant for several months, and so defendant sent him notes dated August 2, 1912, after withholding them because of the condition of the work upon Horowitz's statement, " It is not necessary to withhold the notes.   My understanding with you is that the matter shall be investigated and adjusted and it will 'save me adverse criticism if you will give me the notes."   So that the reservation of defendant's rights was not a new idea when the notes in suit were given.   Running all through this record is a consistent, outspoken and unyielding insistence by defendant upon his right to question the statements and to impeach their honesty after his suspicions had been aroused by the delay and greatly increased cost of the work and confirmed by his reports from Whiting and the investigation made on the ground.   What plaintiff's representatives in the management of the Thompson-Starrett Company were anxious to get was defendant's final note, and they evidently thought that if they could secure that and pass it over to plaintiff it would be safe from any defense, inasmuch as the two corporations were not identical in interest.   Defendant believed the Thompson-Starrett Company meant to act in good faith and not only give him the fullest opportunity for investigation, but assist him to the fullest extent by any records in its possession, that the truth might be ascertained and the com-

First Department, June, 1920.          [Vol. 192.

pany would then do the right thing and give defendant credit on his account for any loss due to incompetency, carelessness, inexcusable delay, extravagance or dishonesty. An honest contractor could not do less than this. It is apparent from Horowitz's correspondence that he had more than a suspicion that all was not right with the work and he constantly impressed upon defendant his determination to adjust anything that was wrong, nor did he abandon this position and refuse to recognize any just cause for complaint, until after defendant's final note had been obtained. The Thompson-Starrett Company under the domination of plaintiff's representatives not only did not place at defendant's disposal its records and seek to assist him in ascertaining the truth, but steadily and vigorously resisted every effort that defendant made not only to ascertain the truth from their books, but anywhere else. When defendant's attorneys asked to be allowed to examine the books of account and vouchers of the Thompson-Starrett Company in so far as they referred to the Uva job, a motion was made at a meeting of the finance committee on September 3, 1914, when the letter was read, that such books of accounts and vouchers be made accessible to said attorneys. The motion was made by Mr. Boardman, an attorney of high standing and the largest stockholder of the company, who advised that the contract with defendant was one of agency, whereby under the rules of fidelity they should be disposed to show their principal the evidence; but the motion was defeated, Mr. Boardman alone voting " aye." Notice of this resolution was sent to defendant's attorneys. At the same meeting a resolution was offered by Mr. Bedford, one of plaintiff's representatives on the committee, that the matter be referred to Mr. Frank Platt with the statement that it was the sense of the committee: " That we are inclined to offer every facility to Mr. Pam and his attorneys to examine the correctness of our books, provided so doing in no way prejudices our interests in the pending litigation; " but of this resolution no notice was given to defendant or his attorneys and nothing was ever done thereunder. The conclusion is irresistible that the negotiations of these notes was in breach of faith and solely for the purpose of allowing a third person to recover upon them, if possible, and to prevent defendant

from asserting as against them any claims or defenses he might honestly have as between the original parties. Good faith would have required the honest and open adjustment of the rights of the contracting parties upon a disclosure of the real state of the contractor's books and knowledge, instead of subjecting defendant to the intolerable burden of preparing and presenting his defense at such a distance from the field of the operations under the original contract. It would also have led them to retain those notes in their possession instead of passing them over so soon to the plaintiff, which sought to entirely destroy the effect of the agreement under which the notes were given. If the Thompson-Starrett Company for any reason was unable to retain possession of the notes, its duty was to apprise the person to whom they were transferred of the conditions under which they were given and of the uncertainty as to the amount due thereunder and to refrain from unjustly seeking to change the character of the notes or the extent of the obligation thereupon.

Plaintiff sought to establish that it was the holder of these notes for value in due course and that the same were taken without knowledge or notice of any claims, defenses or equities of the respondent. But the contrary of these propositions has been affirmatively proven by the defendant. Concededly the equities, defenses and claims of the defendant were discussed at a meeting of the finance committee of the Thompson-Starrett Company. But plaintiff sought to fix the date as December nineteenth, after the notes in question were discounted by plaintiff. There are peculiar circumstances, not necessary to advert to here, which destroy the force of the evidence and records tending to fix this as the date when the discussion as to defendant's claims took place. The record establishes satisfactorily that Horowitz did in fact communicate as early as September or October to the finance committee of the Thompson-Starrett Company, including plaintiff's representatives therein, his belief that he would have a difficult time getting renewal notes from defendant, and had discussed with them defendant's claims and complaints, and had advised them that defendant should have ample opportunity for investigation, and an adjustment of any claim for overcharge or otherwise. For the reasons

heretofore given, including the relationship between the parties, it seems to me clear that plaintiff is chargeable with knowledge and notice of the conditions, terms and agreement under which the notes were delivered. The learned trial court in his opinion held that upon the facts shown Mr. Kelsey and Mr. Stanley would have been presumed to have constructive knowledge of the facts regarding defendant's rights and claims, citing *Ward* v. *City Trust Co.* (117 App. Div. 130; 192 N. Y. 61) and *Republic Life Ins. Co.* v. *Hudson Trust Co.* (130 App. Div. 618; affd., 198 N. Y. 590). But he also found that it was not necessary to resort to constructive notice as the evidence satisfactorily established actual notice to both the officials named.

In other jurisdictions, under circumstances not always so persuasive as those proven in the present action, knowledge has been charged to one corporation because of its connection through common agents or officers in another corporation. In *Matter of Cotton Manufacturers' Sales Co.* (209 Fed. Rep. 629) the corporation pledged at different times its accounts receivable to a bank and the bank appointed the president of the corporation its agent for receiving payments on these accounts and turning the money over to the bank. Within five months the corporation went into bankruptcy. Held, that the knowledge which the president of the corporation had or should have had, of the insolvency of the corporation, was imputable to the bank.

In *Vandagrift* v. *Bates County Investment Co.* (144 Mo. App. 77; 128 S. W. Rep. 1007) a bank and an investment company had the same officers, adjoining places of business and used the same vaults. The investment company sold to the bank after maturity two notes secured originally by a deed of trust, which had, however, been foreclosed. This would be a fraud on the bank, unless it had notice. Held, that the bank's information as to the fact was as complete as could be imparted, and because of the confidential relation between the two corporations, the bank must have been acquainted with all the facts pertaining to the transaction.

In *First Nat. Bank* v. *Chowning Electric Co.* (142 Ky. 624; 134 S. W. Rep. 1156) the case turned on whether knowledge of the directors of the Jefferson County Electric Com-

pany of the priority of certain liens over a mortgage taken by the bank was imputable to the bank because it had the same directors.  In the course of its opinion the court said (at p. 1158): · " But it is insisted that, inasmuch as McClarty, Bickel, and Doherty were directors both of the Jefferson County Electric Company and of the bank, notice to them was not notice to the bank because of the conflict of interests developed by the facts of this case.  The solution of this question depends upon the condition of affairs at the time it is alleged notice was given.  * * *  So far as the electric company was concerned, it was immaterial whether the bank or the lien claimants were paid first.  There was, then, absolutely no conflict of interests between the bank and the electric company.  Nor is there now any contest in this action between the bank and the Jefferson County Electric Company.  It is perfectly plain, therefore, that, so far as the relationship which they sustain to the two corporations is concerned, there is nothing to show that it was the duty of McClarty, Bickel, and Doherty to withhold from the bank information which they obtained as directors of the electric company.  On the contrary, it was their duty to impart such information to the bank, for in so doing they were not in any wise acting against the interests of the electric company."

In *First National Bank* v. *Burns* (88 Ohio St. 434; 103 N. E. Rep. 93; 49 L. R. A. [N. S.] 764) the president of the bank, as an individual, sold to the bank certain promissory notes obtained by fraud.  The defense set up was that the bank had knowledge of the fraud.  The court said: " In a case of contract, as in the case at bar, there is no need of communicating knowledge, because the principal in law is already conclusively presumed to have that knowledge.  The principal's liability does not depend upon the agent's duty to communicate, or the likelihood that he will communicate, his knowledge to the principal, but upon the fact that the agent is the *alter ego* of the principal, acting for the principal, and knows that his acts and knowledge *ipso facto* become the knowledge and acts of the principal."

In *Union Investment Co.* v. *Epley* (164 Wis. 438; 160 N. W. Rep. 175) the cashier of a bank was also president of a land company.  The land company took a note of the defendant in

exchange for its stock, but by agreement the delivery of the note was conditional and revocable. The land company indorsed the note to the bank. It was held that the bank was chargeable with the knowledge the cashier had of the defense to the note, and, therefore, was not a holder in due course.

In *Bank of Florala* v. *Am. Nat. Bank of Pensacola* (75 So. Rep. [Ala.] 310) the cashier of the Florala Bank pledged his Florala Bank stock to the Pensacola Bank for debts in 1911 and 1912, but there was no transfer on Florala Bank's stock book. The Florala Bank sought to foreclose its statutory lien on the stock for debts of the cashier contracted in 1913 and 1914. The president of the Florala Bank knew of the pledge to the Pensacola Bank through conversations with the president of the Pensacola Bank and with the cashier. It was held that the Florala Bank had actual notice at the time the debt to it was incurred of the pledge to the Pensacola Bank, and, therefore, the Pensacola Bank's lien was entitled to priority.

In *Farmers' & Merchants' State Bank & Tr. Co.* v. *Cole* (195 S. W. Rep. [Ct. of Civ. App. Tex. 1917] 949) the president and vice-president of the Farmers' and Merchants' Bank had knowledge of the failure of consideration for notes in which it was payee. Upon the failure of the Farmers' and Merchants' Bank, the Continental Bank was organized to take over its business, and these two officers became executive officers in the Continental Bank. At a directors' meeting of the Continental Bank, one of these officers made the motion which authorized the president of the Continental Bank to make the contract to take over the notes in suit. It was held that the Continental Bank was chargeable with the notice of this officer of the defense to the notes.

In *Merchants' Nat. Bank* v. *Marden, Orth & Hastings Co.* (125 N. E. Rep. [Sup. Jud. Ct. of Mass.] 384) the Carolina Products Company made, and defendant indorsed, the notes in suit, which were placed in the hands of one Cooper, not to be negotiated until the truth of certain representations as to the condition of the Carolina Products Company could be ascertained. Defendants were buying a controlling interest in the stock of that company and were refinancing it. In the course of its opinion the court said (at p. 387): " The

Bank of Southport, of which Cooper was president, held overdue paper of the Carolina Products Company for which the note in question was exchanged. The history of the financing of the company by the bank when viewed in connection with the evidence of Cooper's knowledge of the company's financial resources, and of his desire and purpose to protect the bank's interest and save it from loss, coupled with the cashier's evidence ' that he supposed Cooper as president of the bank had authority to exchange the note,' warranted a further finding [by the jury] that Cooper acted for the bank. If he did. it is chargeable with his knowledge and is not a holder in due course [citing cases]. The case of *Corcoran* v. *Snow Cattle Co.*, 151 Mass. 74, where the president acted in his own interest and not in that of the bank is clearly distinguishable."

The knowledge which plaintiff had of the infirmities of this note, and with which it is chargeable because of the knowledge acquired by its representatives in the management, supervision and control of the Thompson-Starrett Company, such representatives being designated and installed by plaintiff in their offices and positions in the company for the very purpose of acquiring such knowledge for plaintiff's guidance and benefit in its financial dealings with defendant, was as follows, as succinctly put by the learned trial court: " Full statements of the claims to defenses as against the notes, the complaints as to overcharges, the facts that an investigation was being carried on into the alleged overcharges with the end in view of adjusting the amount actually due, and that there existed an agreement between the Thompson-Starrett Company and the defendant that the notes were not an evidence of indebtedness to the amount set forth therein, but a mere means of preserving the *status quo* until the amount actually due could be ascertained and agreed upon, were all disclosed fully and circumstantially in letters and documents in the files of the company, not promiscuously scattered through, but all collected into one folder and labeled." (155 N. Y. Supp. 340.) And this written evidence of the situation was in addition to the knowledge gained by plaintiff's representatives in the company by oral communications as well.

It was no error to allow defendant to prove the actual

First Department, June, 1920.    [Vol. 192.

agreement under which the notes in suit were given, and that a condition was attached to their delivery. This is not a case of an unconditional delivery of a note, with a claimed condition subsequent, which being inconsistent with and contradictory of, the terms of the notes, could not be proved by parol evidence and did not constitute a defense thereto, as laid down in *Jamestown Business College Assn.* v. *Allen* (172 N. Y. 291). The defendant in the present case has always claimed that the notes were conditionally delivered to the Thompson-Starrett Company and that they never became valid, binding notes in any definite amount in the hands of the company, but were at all times held by it subject to the adjustment of the amount due between the parties. This brings the present case within the rule laid down in *Smith* v. *Dotterweich* (200 N. Y. 299) as follows (at p. 305): " When the oral testimony goes directly to the question whether there is a written contract or not, it is always competent; but when the effect of the oral testimony is to establish the existence of a written contract, which it is designed to contradict or change by parol, then the spoken word must yield to the written compact."

The court distinguished that case from the *Jamestown* case, saying (at p. 306): " The case of *Jamestown Business College Assn.* v. *Allen (supra)* is a salient illustration of the converse of this rule. There the promissory note was rendered effective and complete by an unconditional delivery. The payee agreed to release the maker, and to cancel the note, upon a future contingency which might or might not arise. That was clearly a condition subsequent which brought the case within the general rule that a contract reduced to writing and complete in its terms, cannot be varied and contradicted by oral testimony. (*Eighmie* v. *Taylor*, 98 N. Y. 288; *Thomas* v. *Scutt*, 127 N. Y. 133; *Stowell* v. *Greenwich Ins. Co.*, 163 N. Y. 298; *Mead* v. *Dunlevie*, 174 N. Y. 108.) Thus, to state the difference most concretely, the case at bar is one in which the oral testimony tends to show that the writing purporting to be a contract is in fact no contract at all, while in the case of the Jamestown Business College the oral testimony was in direct contradiction of the written contract as to the existence and validity of which there was no controversy."

So also in *Grannis* v. *Stevens* (216 N. Y. 583, at p. 587) it was said: " The manual transfer of an instrument, in form a complete contract, does not, however, bar parol evidence that it is not to become binding until the happening of some condition precedent resting in parol, or that the transfer is for a special purpose. * * * It is a question of fact whether any written agreement, though in possession of the obligee, has been delivered by the obligor as a binding agreement, or whether any delivery that has been made is conditional only. * * * Act and intention are the essential constituents of a delivery which makes the instrument operative according to its terms."

In *Juilliard* v. *Chaffee* (92 N. Y. 529) it was held that parol evidence was proper to show that a writing admitting receipt of a sum as a loan to be paid on demand was not a loan but an advance of money for a special purpose, and it was said: " Nor does it deny the party in whose favor that agreement [the parol agreement] was made, the right of proving its existence by way of defense in an action upon the written instrument, under circumstances which would make the use of it for any purpose inconsistent with that agreement, dishonest, or fraudulent. * * * A party, sued by his promisee, is always permitted to show a want or failure of consideration for the promise relied upon, and so he may prove by parol that the instrument itself was delivered even to the payee to take effect only on the happening of some future event, * * * or that its design and object were different from what its language, if alone considered, would indicate. * * * He may also show that the instrument relied upon was executed in part performance only of an entire oral agreement, * * * or that the obligation of the instrument has been discharged by the execution of a parol agreement collateral thereto, * * * or he may set up any agreement in regard to the note which makes its enforcement inequitable."

Defendant had no reason to believe that the agreement regarding the conditions attached to the delivery of these notes would not be performed in good faith by the Thompson-Starrett Company, and he had no reason to believe that the notes would be passed over into the hands of third parties, either before or after maturity. The prior notes had been

First Department, June, 1920.          [Vol. 192.

taken up by the company itself and defendant had never had any transactions in relation thereto with plaintiff.

This brings us then to the consideration of the vital question of whether defendant had, in fact, any just grievances as to his treatment by the Thompson-Starrett Company in the conduct of the work on the Uva project. As to this, it seems to me that the record conclusively demonstrates that the operation was not carried out in such a way by the Thompson-Starrett Company as to fulfill its obligation of diligence, honesty and good faith to the defendant. A contract to do work upon a basis of cost plus a stipulated commission does not mean that the contractor has the right to expend any amount of money he may see fit upon the work, regardless of the propriety, necessity or honesty of the expenditure, and then compel repayment by the other party, who has confided in his integrity, ability and industry. While the statements as presented by the contractor made out a *prima facie* case of its right to recover the amount shown thereby, accompanied as they were by vouchers and proof of payment, the defendant presented proof which impeached these statements, showed that they were in many particulars deceptive and unreliable, and that many items appearing thereon represented extravagance, waste and dishonesty upon the part of contractor's employees and representatives on the job. Sufficient was shown to completely destroy the value of the statements and vouchers and to open the question as to what was the real cost of the work, honestly, efficiently and properly done. Among the vast amount of proof upon this feature of the case it was proved by defendant:

(1) That irregularities existed in the use of the funds charged to respondent, including charges to the respondent under the contract for merchandise and personal pleasure expenditures, all unrelated to the work to be performed under the contract;

(2) That the superintendent was incompetent and wasteful and reckless in his relationship to the work in hand, as disclosed by the evidence;

(3) That the cashier made expenditures for merchandise and jewelry for his wife and for other uses of his wife and others unrelated to the contract, and charged such unrelated expenditures to the respondent;

(4) That this same cashier was unemployed at the time he was engaged by the contractor (having been so employed by it prior thereto), and as cashier received a salary of $100 per month; while on the work he was giving dinners and wine parties, and made use of the funds furnished by the contractor to pay for such entertainments and for clothing, jewelry and pleasure purposes of his wife and charged the same to respondent as cost of work under the contract;

(5) That this cashier immediately after the completion of the job admitted to a witness having made from $12,000 to $15,000 on this job and exposed large rolls of paper money and quantities of gold and engaged in lavish expenditures of a personal nature with bills of large denominations;

(6) That the records and the books of the contractor relating to the expenditures made for account of respondent are available except the time books kept by Snelgrove, the timekeeper, from which Meredith, the cashier, made up the payroll and pay checks, being the foundation of alleged disbursements of $52,405.85 charged to the respondent as the cost of labor, and these very time books not produced are proved to have been shipped in one box and received at the office of the contractor in Chicago in charge of Morton, the representative of the contractor who had charge of the work, and the loss or destruction of these time books is unaccounted for either by Morton or any other representative or officer of the contractor; these time books being the only and best evidence to justify and prove the propriety and correctness of the disbursements alleged to have been made for labor on this job;

(7) It is admitted in the letter of the contractor written on June 25, 1912 (and before the notes in question were made), to the contractor's agent, Morton, that the contractor had seriously " fallen down " on its part, and delinquency is admitted both by the president and by Morton, the contractor's manager who was in charge of the work in Wyoming (even though such delinquency is claimed to be exaggerated by respondent);

(8) It is proved without contradiction by the evidence of men actually engaged in the operation, what work was actually done and what labor was actually performed; and at the

then existing schedule of cost, the aggregate price of labor and materials combined was proved to be approximately between $61,000 and $64,000, while the amount charged to respondent by contractor for the labor alone is $52,405.85;

(9) Defendant also proved by competent experts, thoroughly qualified to pass on the value of this particular work, what labor and materials were required to do the work and that the combined cost under then existing conditions would be approximately between $62,000 and $67,000;

(10) It is also proved that the amount charged as expenditures is substantially one hundred per cent more than the amount proved by the witnesses who had actually worked on the job to be a proper expenditure and reasonable and proper cost, and also so proved by the expert witnesses.

To all of these charges of dereliction the contractor has made no satisfactory defense. It only sought to minimize the financial extent of the loss thus incurred by defendant through improper charges against him. But it has been unable to meet the specific charges which impeached its statements and vouchers and destroyed their value as conclusive evidence against defendant.

It may be noted that plaintiff made practically no effort or attempt to prove any expenditure of funds beyond the checks issued by it to its cashier in Wyoming. It made no effort to prove by the cashier, Meredith, the expenditure of any funds represented by these checks, although Meredith, as is shown by the record available, being then in the Utah State Penitentiary, was called as a witness by respondent in the presence of Morton, representative of the contractor and counsel, and offered for examination, nor was Jennings, the superintendent, called to testify, although his integrity had been severely attacked and his faithfulness and competency questioned.

The credible evidence justified the learned trial court in finding that the reasonable cost of the work performed and materials furnished by the Thompson-Starrett Company, together with ten per cent for plant and overhead charges, together with the five per cent of such cost as compensation to it, was $72,644.95, and that the total amount of defendant's indebtedness to the Thompson-Starrett Company on November 1, 1913, was only $53,150.64.

In my opinion, the judgment appealed from is correct and should be affirmed, with costs.

CLARKE, P. J., and MERRELL, J., concur; LAUGHLIN, J., dissents.

LAUGHLIN, J. (dissenting):

This is an action on two promissory notes made by the defendant to the order of the Thompson-Starrett Company, on November 1, 1912, one being for $96,733.52, and the other for $3,094.63, payable in one year, with six per cent interest. The plaintiff discounted the notes for the payee on the 7th of December, 1912, which was before maturity. By the pleadings, which are an amended complaint and an amended answer, it stood admitted that the notes, which recite that they were given for value received, were duly made, executed and delivered to the payee on the date thereof and that they were duly indorsed and delivered to the plaintiff on the 7th day of December, 1912, in consideration of the face value thereof. Defendant pleaded, but failed to prove, payment; and evidently on the theory of payment put in issue the allegations that the plaintiff was the holder and owner of the notes and denied the allegations with respect to non-payment. For a second and partial defense the defense pleaded facts arising in the course of and with respect to the execution and performance of an agreement between him and the payee for certain construction work by it for him at Uva, in the State of Wyoming, by which it was to be reimbursed by him for the cost of the work and to receive for its compensation five per cent on the cost, and he was to give in payment his promissory notes on monthly statements to be rendered by the payee with respect to the cost, to which was to be added the five per cent. The material facts so pleaded are that the payee entered on the performance of the work and rendered to defendant, from time to time, statements with respect to the cost; and represented that they were correct; that the defendant relying thereon executed and delivered notes and paid on account of the notes, $24,646.92; that on November 1, 1912, the amount of his outstanding notes aggregated the face of the larger note in suit; that the payee was unskillful,

negligent and wasteful in the performance of the contract, and unreasonably and improperly delayed the work, thereby largely and improperly increasing the cost, and that the statements rendered were false and fraudulent in that they contained charges for unnecessary and useless supplies and materials, and for work and labor done and supplies and materials purchased at excessive rates, and for some expenditures not belonging to the work, and others caused by the unskillfulness and negligence of the payee and by unreasonable delay on its part, and that such charges were knowingly made by the agents and servants of the payee with intent to deceive and to defraud the defendant; that these facts were unknown to the defendant when he received the statements and gave the notes called for by the contract, but that upon discovering them he notified the payee; that thereafter and on the maturity of the outstanding notes, and, in renewal thereof, he made and delivered the larger note in suit, and gave the other note in suit on a statement rendered by the payee with respect to disbursements made under the contract for the month of July, 1912, and that he expressly reserved to himself " all rights and claims against said notes alleged in the amended complaint in connection with the performance of said agreement on the part of said company." The defendant further alleged that the plaintiff, before receiving the notes, had knowledge of the claims of the defendant against the payee " in respect of said notes and the transactions hereinbefore alleged and of the reservation by the defendant of his rights and claims against said notes." The case was tried and decided on these pleadings without amendment.

The court found that the notes were given and were indorsed and delivered to the plaintiff as alleged, and were discounted by it, and the proceeds placed to the credit of the account of the payee, and, in effect, that the amount of such credit was withdrawn by the payee on or before December 16, 1912, for it was found that on that day the plaintiff became the holder of the notes for value. The court found, however, that the plaintiff did not receive the notes in due course and that prior to receiving them and paying therefor, and, before paying the full amount, it had notice of the reservation by the defendant of his rights and claims against the notes " as

set forth in the amended answer," and that before paying the full amount, plaintiff had notice of sufficient facts to put it on inquiry with respect to the defense pleaded, and if it had inquired, it would have ascertained the facts to be as pleaded in the amended answer; that the plaintiff did not take the notes in good faith; that the notes were made and delivered by the defendant under an agreement between him and the payee that they were made and delivered subject to all his rights, claims and defenses, and without prejudice or waiver of any claims he might have against the notes on any account in connection with the agreement, and that such rights were expressly reserved by him; that the payee was unskillful, negligent and wasteful in performing the work and unreasonably and improperly delayed it; whereby the cost was largely and improperly increased; that the statements of cost rendered by the payee were false and fraudulent in that they contained charges for expenditures not belonging to the work, and for moneys dishonestly appropriated by the agents, servants and employees of the payee, and contained charges for expenditures in consequence of unskillfulness, gross negligence and waste in the performance of the contract; that the plaintiff had notice that the title of the payee was defective and failed to sustain the burden of showing that it was a holder in due course; that the amount owing by the defendant under the notes has not been liquidated, and that the reasonable cost of the work and materials, with ten per cent plant and overhead charges, and the five per cent compensation added thereto, was $72,644.95, and that the balance owing by the defendant on account of the work was $53,150.64. As conclusions of law the court found that the plaintiff did not take the notes in good faith; that there was a *partial* failure of consideration for the notes which is a defense *pro tanto* and that plaintiff was only entitled to recover on the notes for the reasonable cost of the work, plus five per cent, less the amount paid to apply on the cost of the work, and was not entitled to interest on account of the fact that the amount owing had not been liquidated, and judgment was directed in favor of the plaintiff for $53,150.64 with costs. The case was submitted on the proposed findings and briefs, and the court wrote an opinion. (155 N. Y. Supp. 333.) Thereafter addi-

First Department, June, 1920.                    [Vol. 192.

tional findings, to conform the decision to the views of the court expressed in the opinion, were made at the request of the defendant, but are not embodied in the decision. The court thereby found that a note for $50,000, of which the larger note in suit was in part a renewal, was given by the defendant May 1, 1912, in renewal of former notes, and that it was given subject to claims and defenses against the same and on the representation that the statements of cost which had been rendered by the payee were correct, and on an agreement that an investigation with respect thereto would be made and that, if anything was found wrong, it would be corrected and an adjustment made, and that for the work remaining to be done notes would be given maturing November 1, 1912; that pursuant thereto, three notes were thereafter given, aggregating $49,828.11, maturing on November 1, 1912; that the notes in suit were given, not as evidence of defendant's indebtedness in a fixed amount, but with the distinct understanding that the amount was to be fixed after an investigation into the *bona fides* of the bills or statements rendered by the payee, and were subject to all of the defendant's defenses and claims against the notes; that the notes in suit were negotiated by the payee in breach of faith and in fraud of the rights of the defendant; and, as conclusions of law, that the title of the payee was defective, and that the plaintiff was not a holder in due course and was only entitled to recover the amount actually due to the payee.

One Louis J. Horowitz was the president of the payee, which in 1911 was engaged in various building enterprises throughout the country, and was constructing a $4,000,000 office building to be known as the " Insurance Exchange Building " for the defendant and one Graham in Chicago. Defendant had invested upwards of $100,000 in acquiring all the stock and bonds of the North Laramie Land Company, which owned 4,000 acres of reclaimed land in Platte county, Wyo., and had acquired the right to furnish water for irrigating purposes for 4,000 more acres of reclaimed land, and was engaged in constructing a system of irrigation consisting of three storage reservoirs connected with the North Laramie river and with one another by about twenty miles of ditches. The work was then being done under the supervision of John A. Whiting, the

land company's engineer, and one Shelburne, its resident engineer. The work, however, was not being done satisfactorily and the defendant was desirous of completing it to enable him to realize on his investment in the enterprise. Defendant requested Horowitz, representing the payee, to finish the work and showed Horowitz plans that had been prepared by Whiting for concrete facings for two dams. Horowitz stated that it was too small an enterprise ordinarily to interest the payee, but, in appreciation of defendant's having given it the contract for the Chicago building, it would undertake the work. Defendant, who was an experienced lawyer and the general counsel for many corporations, thereupon prepared and submitted to Horowitz a proposed contract, as follows:

" CHICAGO, ILL., *August* 17, 1911.

" THOMPSON-STARRETT COMPANY,

" 51 Wall Street, New York:

" GENTLEMEN.— I am sending you herewith drawings and general specifications for reinforced concrete facings to be constructed on the North Laramie Land Co.'s project near Uva, Wyoming.

" I desire you to put yourselves into communication with Mr. J. A. Whiting, Engineer, Cheyenne, Wyoming, who will give you any additional necessary information and instructions you may require for the purpose of executing this work.

" I herewith employ you to execute such work as Mr. Whiting may direct you in writing to execute, upon the understanding that I will pay you for this work on the basis of cost to you plus five (5%) per cent. of the cost for your profit.

" I agree that your cost is to include expenses of every nature incurred by you, including railroad transportation, board bills, and wages of people employed entirely or in part in connection with this work.

" You are to render to me monthly statements showing the cost to you of the work at the end of each month. To this cost you will add the 5% commission above referred to. Against such bills I will give you my promissory notes with interest at the rate of six (6%) per annum, maturing May 1st, 1912.

"As soon as practicable for you to do so, I will be glad to

have from you an approximate estimate as to the total prob-
able cost of the work ordered up to any one time, such estimate
of course to be in no way binding upon you.

" Yours very truly,
" MAX PAM."

The defendant at the same time prepared a letter to Whiting,
a copy of which he inclosed to Horowitz with the proposed
contract.  In that letter he incorporated a provision for the
approval of the vouchers of the contractor in advance by
Whiting.  Horowitz, on receiving the proposed contract and
the copy of the letter to Whiting on August 17, 1911, as
president of the payee wrote the defendant suggesting that,
inasmuch as the approval of the vouchers was not provided
for in their agreement, defendant write Whiting that such
approval was unnecessary.  Horowitz testified that he stated
to the defendant that such a checking up of vouchers in
advance was not customary and, on most jobs, the payee
received its money before it submitted vouchers, and that it
did not wish to be delayed in receiving its money by the
checking up of the vouchers in advance by an engineer of
whom it knew nothing, and that the vouchers would be sub-
mitted to the defendant and that, after he reimbursed the
payee for the money expended, " he could then do such
checking as he had a mind to."  It is evident that this work
was not of the kind usually performed by the payee, and it
was to be done at a very remote and inconvenient point with
respect to obtaining labor and material.  The work to be
done and the material to be used were to be determined by
Whiting, and the work was to be done under his general
supervision and under the direct and immediate supervision
of the defendant's resident engineer, Shelburne.  Horowitz's
letter suggesting the elimination of the provision for the
approval of the vouchers in advance was received by the
defendant before he forwarded the letter which he had written
to Whiting, and, without protest, he thereupon eliminated
that provision.  The payee had an office in Salt Lake City
in charge of one Morton, and Horowitz forwarded to him
the plans for part of the work which had been delivered to
him by the defendant, and directed him to make arrange-

ments to meet the defendant's representatives on the ground and plan for the execution of the work. Pursuant to these instructions, Morton went to Uva on the 24th of August, 1911, and with Whiting and one O'Neill, of the land company, inspected the work as then contemplated and estimated that it could be completed in about three months at a cost of about $30,000. At that interview, Whiting gave Morton a formal order for that part of the work which could then be proceeded with, and Morton thereupon proceeded to employ a staff to take charge of the work, which he contemplated visiting at short intervals from his office in Salt Lake City, which was about 500 miles from Uva. After inquiries into satisfactory references, he employed one Jennings of Salt Lake City as superintendent at a salary of $175 per month and expenses, and also employed at $100 a month and expenses one Meridith, whom he had known since 1905, and who had worked for the payee for two years commencing in 1907 as cashier at Salt Lake City, and during that time had handled satisfactorily for the payee about $1,500,000, while receiving a salary of $125 per month. Morton also employed one Snelgrove, a young engineer, as timekeeper. The payee's representatives established a camp and commenced the work in September, 1911, and continued the work with the exception of concreting, which it was obliged to suspend earlier on account of the cold weather, until January 6, 1912, when weather conditions required complete suspension of the work. Work was resumed again on January 27, 1912, on the ditches and in hauling material and continued until April thirteenth, when the weather permitted the resumption of the work of concreting, and from that time it was continued until it was wholly completed on the 3d of July, 1912.

The vouchers for the work to the end of December, 1911, aggregated $52,396.79, but it appears that more work had been ordered by Whiting than Morton made his estimate on, and the cost of the work was largely increased owing to the fact that the cold weather set in unusually early in the fall of 1911, the temperature having fallen to zero in the month of October. It appears that down to the end of December, 1911, as great progress as could have been expected was believed to have been made by Whiting and Shelburne,

defendant's representatives, and by the payee's representatives. No complaint had been made and the suspension of work had been made at the suggestion of Whiting. There was no direct supervision of the work either by Whiting or Morton between January twenty-seventh and April thirteenth. During that period it was left to the other representatives of the payee acting under the direction of Shelburne with respect to the work. The first complaint from the defendant with respect to the work was a telegram to Morton on April 9, 1912, in which he stated that he had relied upon the assurances of Horowitz that the work would be done as economically and expeditiously as possible, and that the cost down to that time had been many times the estimate made and was appalling, and that the work was not complete and that the water was rising and the reservoirs and ditches were not ready. He also stated that he had had a favorable offer for the sale of the whole project which, owing to the fact that the work was not completed, he could not accept, and that he wished to know definitely when the work would be completed. Morton thereupon wrote Horowitz explaining the reasons for the increase in the cost, which were as already stated, and this was communicated to the defendant. On the 12th of April, 1912, defendant wrote Whiting stating that the vouchers received down to March first aggregated $67,178.72, and that apparently considerable work remained to be done. To this Whiting replied that the present progress of the work was very satisfactory and that the project would be in shape to conserve water at an early date, and that the length of time required to complete the work would depend upon the weather and the number of teams obtainable, and that he believed it would be completed within sixty days. He also stated that favorable weather was some thirty days later that year than usual. From that time on and until its completion there was no serious or well-grounded complaint with respect to the progress of the work.

Notes aggregating, with interest, $72,225.10 were to fall due May 1, 1912, and there was an interview between Horowitz and the defendant on April twenty-ninth concerning them. With respect to this and other interviews and matters, there was a serious conflict between the testimony of Horowitz

and that of the defendant. The learned trial court accepted the testimony of the defendant, and as it was a question of veracity with but little or no evidence corroborating either, and both were interested, an appellate court would not be warranted in holding that the trial court erred in so doing. We, therefore, accept the testimony of the defendant, but not in all respects the construction placed thereon by the trial court. With respect to that interview the defendant testified, in substance, that Horowitz called at his office and he stated to Horowitz that the cost of the work down to that time had very materially exceeded $60,000, which was a revised estimate made by a representative of the payee in December, 1911, and that he objected to paying the notes falling due May first in view of the excessive cost and owing to the delay in completing the work, and that he was unwilling to pay them without some investigation on his own account " with reference to the correctness of the situation;" that Horowitz expressed confidence that Morton had given the work every possible attention, that the cost was no more than it should be, and that the increased cost was due largely to weather conditions and to the additional work ordered by the engineers; that he thereupon stated that he had no information from his own representative with respect thereto, and that he " wanted to write Mr. Whiting and get some information;" that Horowitz then suggested that he pay the notes down to $50,000 and " renew the $50,000 until November 1st," and that in the meantime he could make whatever investigation and inquiry he cared to make to satisfy himself that what Horowitz had continually said to him was correct; that he then asked Horowitz " what about the balance; is there any assurance, is there any indication what I am to meet there?" and that Horowitz said, " Let whatever balance there is, let that — make your notes payable November 1st, so that in the meantime the work will be completed, and then if there is anything wrong, it will be corrected;" that Horowitz assured him that the work would cost him infinitely less by the payee's doing it than if any one else had done it, whereupon he said: " Well, I am willing to do that; I am willing to pay you down to $50,000, and then in the meantime I will give you these notes, but there must be some

First Department, June, 1920.    [Vol. 192.

adjustment between now and November 1st and find out exactly what is right;" that Horowitz replied: "That is perfectly satisfactory to me. I will find out what the amount is so that we can figure it out." The figures representing the amount necessary to reduce the indebtedness to $50,000 were furnished, and on April 30, 1912, defendant inclosed a check to Horowitz for $22,225.10 and a note for $50,000 payable on or before six months from May 1, 1912, " account my notes and obligations held by you in re North Laramie Land Company," and requested that Horowitz return the other notes. The other notes were returned to the defendant shortly thereafter, and he testified that he had previously received notice from the plaintiff with respect to them and that, on receiving them, he noticed that they had been discounted by the plaintiff. This is the only testimony in support of the supplemental findings, to which reference has been made, with respect to any agreement or understanding between the defendant and the payee at the time the note for $50,000 was given on May 1, 1912. There is no other testimony or evidence bearing on the question as to whether the note then given, or the notes thereafter given on vouchers subsequently submitted by the payee, were to be held by or to be negotiated by the payee. Defendant continued to give notes on vouchers submitted for the completion of the work. The aggregate of the vouchers, plus the five per cent which the payee was to receive as compensation, was $121,504.56. Defendant retained the vouchers as received and never forwarded any of them to Whiting or to Shelburne to check up or for information until the 25th of June, 1912, when they aggregated $100,143.27. The first complaint by Whiting with respect to extravagance or negligence in the performance of the work was a telegram on May 17, 1912, in answer to a telegram from the defendant referring to the fact that the work had then cost over $83,000 and that the payee claimed that the increase in the cost was due to extra work constantly ordered by Whiting. In that telegram Whiting stated that the contractor was constantly exceeding its own estimate by fifty per cent and that there was lack of economy and proper handling of men, and he suggested that the contract be terminated and stated that he could take charge of the plant

and equipment and proceed with work, employing the payee's concrete foreman as superintendent, and save the defendant time and money, and that it was impossible for him to regulate the cost under the present management. The defendant sent a copy of Whiting's telegram to Horowitz, who replied on May 21, 1912, that in his opinion Whiting's statements were not justified and that he thought Whiting had made too low an estimate and was attempting to place the blame on the payee, and said that the work was taken over by the payee as an accommodation to the defendant and that the payee was quite willing to relinquish it, and expressed the hope that the defendant would act on Whiting's recommendation. The work evidently was nearly completed at that time, and the payee was continued in charge and completed it to the entire satisfaction of the defendant with respect to the work itself. On the 13th of June, 1912, Whiting wrote O'Neill of the land company, criticising the work that was being done by the payee and complaining of negligence and incompetency on the part of the superintendent of the payee, and stating that he had complained to Morton and to the superintendent with respect to the cost of the work; but as a witness he admitted that he had made no such complaint to them. On the 23d of July, 1912, Horowitz wrote the defendant asking for a check or note for vouchers aggregating $35,150.04 that had been rendered, and thereafter there was an interview between the defendant and Horowitz with respect thereto. The defendant testified that he then informed Horowitz that he was not disposed to give any more notes; that he had been informed through Whiting that Morton was not on the job between December and the end of May, although he had been assured by Horowitz that Morton would give it his attention, and he took the position that the matter should remain for adjustment and that a proper investigation should be made as he suggested when the note of May first was given; that Horowitz replied that his finance committee was criticising him for not getting the notes for expenditures that had been made a month or two months before, and said: " It is not necessary to withhold the notes. My understanding with you is that the matter shall be investigated and adjusted, and it will save me adverse criticism if you will give me the

notes;" and that he replied, "Very well, I will do so." Horowitz denied that conversation.

The notes were inclosed to Horowitz by the defendant with a letter, dated August 2, 1912, containing no reference to the reservation with respect to adjustment, but merely stating that they covered the last two statements which were being sent to Whiting for review. According to the testimony of the defendant, there was an interview between him and Horowitz in Chicago early in September, 1912. With respect to that interview he testified that he was desirous of taking up the matter of the adjustment of their account because he expected to be very much occupied with personal matters between then and the first of November; that he informed Horowitz that the opportunity for making the necessary investigation had not been sufficient, and Horowitz agreed to that on the ground that the men who worked on the job had become scattered; that he told Horowitz that he was unwilling to make any payment on the notes until after the subject had been fully and entirely investigated and every effort made to make an adjustment based upon the results of the investigation; that Horowitz asked what he suggested, and that he said that sufficient time should be given to get the information and that the charges were serious, and that Horowitz should be as much interested as he in having an investigation complete and satisfactory; and that to this Horowitz assented and said that he wanted the defendant to be satisfied that he had not been imposed upon, and that the complaint made to him by Whiting had been grossly exaggerated, and he asked what the defendant would suggest doing; that the defendant replied that the notes ought to be renewed for a sufficient length of time to permit the investigation and adjustment; whereupon, Horowitz said that the matter of the defendant's contract, claims and complaints had been the subject of discussion in the finance committee of the payee, and that the committee had charged him with showing favoritism to the defendant through friendship, but that he insisted that the renewal of the notes which he had agreed to should be made so that the investigation could be conducted; that he told Horowitz that he thought the renewal ought to be for a year, to afford ample opportunity for the investigation and for the adjustment after the result of the

investigation; that Horowitz replied that it would be difficult for him to persuade the committee to allow such a renewal but that he felt the, defendant ought to have every opportunity to satisfy himself with respect to the facts, and that he would renew the notes for one year; that he then said, " Of course, Mr. Horowitz, you must understand that these various complaints and claims I have made and whatever defenses I have to these notes are reserved so that they can be the subject of adjustment when the renewal period is up." He did not testify that Horowitz made any reply, but he says they both agreed to expedite the investigation so that abundant time would be left for adjustment. Horowitz admitted an interview with the defendant at about that time, but denied that there was any discussion with respect to the notes, and said that at the interview the defendant claimed to have discovered evidence of irregularity and extravagance, and that he asked for the facts and assured the defendant, if there was anything wrong with respect to the expenditures made by the payee, the payee would suffer the consequences and not require the defendant to sustain the loss. Horowitz contemplated going to Europe in the fall of 1912 and did not expect to return until after November first, when the notes were to fall due. He sailed on the 3d of October, 1912, and did not return until between the fifteenth and twentieth of November of that year. The day before he sailed there was an interview between him and the defendant. At that time there was a balance of over $200,000 due from the defendant and Graham to the payee on account of the Chicago contract, and the defendant executed for himself and Graham four notes for $50,000 each therefor. The defendant testified with respect to that interview that, while receipts for the payments evidenced by the notes were being written out, he asked Horowitz if he had disposed of the renewal of the Uva notes during his absence, and that Horowitz replied, in substance, that he had, but that he had had great difficulty in getting it through the finance committee, and that they insisted that he was altogether too friendly in giving the defendant the renewals, but that he insisted that the defendant should have whatever time was necessary to make a complete investigation and reach an adjustment, and that they

First Department, June, 1920.                    [Vol. 192.

finally agreed to it; that Horowitz asked about the interest, and that he replied by asking what Horowitz would do with reference to the notes if he were going to be away, and that Horowitz answered that he would give instructions to Mr. Pond, the treasurer of the payee, to exchange the existing notes for the renewal notes on the first of November; that Horowitz again asked with respect to the interest, to which he replied that it would be practically impossible to pay the interest because " the amount that is to be payable on these notes is not ascertained " and that the amounts could not be fixed until the " adjustment is reached," and that, therefore, there could be no interest paid " at this time," and that he offered to give a note for the interest payable on demand which could be adjusted at the same time the principal was taken up for final adjustment.   The defendant also testified that the defenses which he referred to in his testimony consisted of the investigation and adjustment of the amount to be paid by him. Horowitz testified that the first reference to the renewal of the notes falling due on November 1, 1912, was at this interview and that, when the defendant requested a renewal for a year, he objected, saying that the investigation would not require a year and did not involve the whole amount, and that the defendant agreed that he would take up the notes sooner if the investigation was finished, but that he wanted the investigation completed.

There was evidence of negligence on the part of the payee's superintendent with respect to the work, and of his incompetency, which, however, was not known to the payee at the time; and the evidence shows dishonesty on the part of the payee's cashier on the job, through which several items, relatively small, however, were included in the vouchers which were not properly chargeable to the work, but this was not known to the payee until long after the work was completed. The learned trial court held that the evidence tending to impeach the vouchers upon which the original notes were given was sufficient to require the plaintiff to bear the burden of showing to what extent the vouchers were correct.   The plaintiff failed to bear that burden, and the court determined the amount to be deducted from the notes in suit by determining what the work should have cost if it had been skillfully and

honestly performed. The learned counsel for the appellant contends that the nature and extent of the evidence tending to impeach the vouchers was not sufficient to constitute a *prima facie* impeachment of *all* the vouchers, and that it did not warrant the ruling to that effect made by the trial court; but in the view I take of the case, it is unnecessary to consider or to decide whether that ruling was right, or whether the theory on which that issue was decided was correct, for I deem it an immaterial issue herein.

The plaintiff was the principal but not the sole banker of the payee of the notes, and since March 9, 1903, it has been represented on the board of directors of the payee by Mr. Kelsey, its president, and Mr. Stanley, its second vice-president, treasurer and the manager of its banking department, and by three others, forming a majority of the board. Kelsey was also chairman of the payee's finance committee, which had general charge of the contracts to be taken by the payee and of its finances. Stanley was also a member of the finance committee and was one of the two members of the auditing committee of the payee. It is unnecessary at this point further to consider the relations between the plaintiff and the payee of the notes, for the trial court properly found that they remained separate and distinct corporations and that the payee was not a subsidiary of the plaintiff.

The latter part of October, 1912, Pond, the treasurer of the payee, informed Kelsey, the chairman of its finance committee, that he had notes of the defendant about to fall due and that Horowitz had agreed to take renewal notes for a year therefor. Kelsey informed him that, since Horowitz was absent, the only thing to do was to take the renewal notes. Thereupon the renewal notes, which had been made by the defendant and left with his secretary for delivery, were procured and delivered to the treasurer of the payee. A few days thereafter a demand note of the defendant for the interest on the notes due November first was likewise received from him by the payee. That note was paid by him on May 2, 1913, by check inclosed with a letter stating that it was without prejudice or waiver of any rights or claims the maker had against the notes then held by the payee, and that any such rights or claims " on any account in connection with the contract " for the con-

struction work were expressly reserved. The defendant's notes due November 1, 1912, in so far as they had been discounted by the plaintiff, were taken up by the payee's check given that day to the plaintiff for $63,406.38. They were retained by the payee for a few days and returned to the defendant on receiving from him, as already stated, the notes in suit. The payee was not in need of funds at the time it received from the defendant the notes in suit, but early in December thereafter it became necessary for it to discount some paper. The treasurer of the payee spoke to Mr. Stanley of having these notes and of the necessity for discounting some paper within a few days, and said he intended to speak to Horowitz about it, and Mr. Stanley approved. The treasurer then spoke to Horowitz, who directed that he have the notes discounted. A few days later and on December 7, 1912, the treasurer of the payee took the notes to the plaintiff and there informed Stanley, its treasurer, that they were the notes he had spoken to him a few days before about having discounted, and Stanley answered " all right " and directed him to the discount clerk, and he informed the discount clerk that Stanley authorized their discount, and they were thereupon accepted and discounted. The testimony of the treasurer of the payee tends to show that he informed Stanley on the first occasion either of the amount of the notes or about the amount that was needed, but that nothing was said as to whose notes they were, and that Stanley on neither occasion examined them. When they became due, no adjustment had been made between the defendant and the payee. The defendant refused to pay them, and the payee likewise refused to pay them and suggested to the plaintiff that it bring an action thereon, which it did.

Accepting the testimony of the defendant, as did the trial court, I am of opinion that the fair inference to be drawn therefrom, and the effect thereof, is only that the amount payable on the notes was subject to deduction according to any adjustment arrived at between the parties with respect to the defendant's claim that the charges for the cost of the work, and for which he gave the notes originally, were excessive. It is perfectly clear, I think, that the notes were unconditionally delivered, and the evidence of the defendant with respect thereto only shows a condition subsequent, which, being

inconsistent with and contradictory of the terms of the notes, could not be proved by parol evidence and did not constitute a defense thereto. (*Jamestown Business College Assn.* v. *Allen*, 172 N. Y. 291; *Smith* v. *Dotterweich*, 200 id. 299; *Grannis* v. *Stevens*, 157 App. Div. 561; affd., 216 N. Y. 583; *Nash* v. *Weidenfeld*, 41 App. Div. 511; affd., 166 N. Y. 612; *Copans* v. *Dougan*, 217 id. 695, reversing 158 App. Div. 896, on the dissenting opinion of BURR, J.; *Pratt & Whitney Co.* v. *Pneumatic Tool Co.*, 50 App. Div. 369; affd., on opinion below, 166 N. Y. 588; *Smith* v. *Hedges*, 89 Misc. Rep. 183; affd., 170 App. Div. 349; affd., 222 N. Y. 701; *Rice* v. *Grange*, 131 id. 149; *Tradesmen's Nat. Bank* v. *Curtis*, 167 id. 194.)

In *Copans* v. *Dougan* (*supra*) the action was on a note against the indorser, and the answer admitted the making and the indorsement of the note and alleged that it was made to secure the defendant Cronk for $200, on account of the purchase price of a house and lot which he had sold to the maker, who had purchased goods for him and guaranteed the account, and it was verbally agreed by all parties to the instrument that Cronk should hold the note and that when it fell due, if he was still liable on his guaranty, the amount of such liability should be deducted from the note. The plaintiff was present when the agreement was made and was fully informed with respect thereto and, therefore, was not a *bona fide* holder in due course. When the note became due, Cronk owed on account of the purchases guaranteed by the maker more than the amount of the note. Mr. Justice BURR, on whose dissenting opinion the decision of the Appellate Division was reversed, wrote, and Mr. Justice THOMAS concurred with him, holding that by the pleadings, which were in precisely the same condition, so far as this point is concerned, as those in the case at bar, the absolute making and delivery of the note were admitted and that, if that were doubtful, the defendant pleaded and attempted to prove that, if at the maturity of the note the payee was indebted to the maker, such indebtedness should be offset against the note, which could not be done even between the original parties.

In *Pratt & Whitney Co.* v. *Pneumatic Tool Co.* (*supra*) it was pointedly held that only conditions attaching to the delivery of a note which go to its existence as a contract may

First Department, June, 1920.	[Vol. 192.

be shown by parol, and that no conditions which concede the existence of the contract and tend to vary its terms may be shown in defense unless properly pleaded as a counterclaim where a counterclaim is available. There, as here, the making and the delivery of the note were admitted, and the defendant pleaded, as a defense only, that it was given for work and material, and that it was agreed that the giving of the note should be without prejudice to the right of the defendant to have the proper deductions made in the amount of the bills theretofore rendered, and that the defendant should not be compelled to pay until such adjustment was made, and then only so much of the note as represented the actual amount of the cost to the plaintiff for work and material. Evidence of these facts was given in the defense of the action, but it was held that neither the defense pleaded nor the evidence given thereunder showed that the note was delivered conditionally and was not to become a contract, or a failure of consideration, but at most showed an offset which could only be availed of by counterclaim.

In *Smith* v. *Hedges* (*supra*), on the facts as stated in the Court of Appeals memorandum of affirmance, it was held that in an action on a note brought by an assignee after maturity, an answer to the action on the note given in part payment for construction work pleading a failure of consideration, in that the work for which the note was given was not performed, was properly stricken out as pleading no defense, as was also a defense that the maker stated when he gave the note that it was for the accommodation of the payee only and that he did not admit that any amount was due or owing to the payee, and that if the work was not completed at the maturity of the note he would not pay it, as was also a defense that he made the note relying on the false and fraudulent representations of the payee that it could and would complete the work within ten days.

In the case at bar there was ample consideration for the giving of the original notes, in that the giving thereof was required by the contract, and the renewal notes rested on the same consideration, for they were given in payment of the former notes which were surrendered, and on the further consideration of the extension of the time of the payment of the

indebtedness, or, in view of the evidence most favorable to defendant, for such amount thereof as might be found on the adjustment to be due and owing from him, and on Horowitz's agreement to make such an adjustment.

There can be no doubt but that, as between the original parties, the payee of those notes became a holder for value, for they were given in payment of former notes which were then surrendered to the maker. (*Kelso & Co.* v. *Ellis,* 224 N. Y. 528; Neg. Inst. Law, § 51; McKinney's notes and citations to the section in his Ann. Consol. Laws of N. Y.; Editors' notes and citations in Birdseye, Cumming & Gilbert's Consol. Laws of N. Y. vol. 5 [2d ed.], p. 5448 *et seq.*) If the action were by the payee on the original notes, I think the defendant could not defend on the theory of partial failure of consideration, which is the only possible defense pleaded here, predicated on the fact that the payee had breached its contract to furnish true and honest vouchers or had overcharged for the work, for the defendant agreed to give the notes on the presentation of the vouchers, and its agreement to perform and its performance of the work constituted the consideration for his agreement to give the notes; but, of course, in that case the defendant could have interposed a counterclaim based on the excessive or unauthorized charges. (*Gillespie* v. *Torrance,* 25 N. Y. 306; *Pratt & Whitney Co.* v. *Pneumatic Tool Co.,* 50 App. Div. 369; affd., 166 N. Y. 588; *Manufacturers' Nat. Bank* v. *Russell,* 6 Hun, 375; *Rice* v. *Grange,* 131 N. Y. 149.) Surely the renewal notes were not open to defenses which could not have been interposed to the original notes, for the agreement between the defendant and Horowitz with respect to the renewal notes did not enlarge the rights of the defendant; and, moreover, here there were additional considerations for the renewal notes, consisting of Horowitz's agreement to make a proper adjustment with the defendant, which he has not breached, for so far as appears there was an honest effort to reach an agreement but without success, and there was also the extension of the time of payment. (*O'Brien* v. *Fleckenstein,* 180 N. Y. 350; *Emerson* v. *Sheffer,* 113 App. Div. 19; *Milius* v. *Kauffmann,* 104 id. 442; *McCormick Harvesting Machine Co.* v. *Yoeman,* 26 Ind. App. 415; *Rice* v. *Grange, supra.*) Ordinarily, a renewal note, where

the note of which it is a renewal is retained, is merely a continuation of the original note, but where, as here, the original notes are given up on the execution and delivery of the renewal notes, the renewal notes are taken for value, for they are taken in payment of the old notes. (*Twelfth Ward Bank* v. *Samuels*, 71 App. Div. 168; affd., *sub nom. Twelfth Ward Bank* v. *Schauffler*, 176 N. Y. 593; *Hayward* v. *Empire State Sugar Co.,* 105 App. Div. 21; affd., 191 N. Y. 536; *Jagger Iron Co.* v. *Walker*, 76 id. 521; *First Nat. Bank* v. *Weston*, 25 App. Div. 414.)

But if the defense pleaded, in so far as it has been proved, would have constituted a good defense as between the original parties, without being pleaded as a counterclaim, on the theory that it shows a partial failure of consideration, it is not available as a defense in this action brought by the bank which discounted the notes for full value before maturity, and, I think, became a holder in due course without notice of any infirmity in the notes or of the facts upon which the defense is predicated. (See Neg. Inst. Law, §§ 91–98.)

There is no evidence of express notice to the plaintiff that the defendant claimed to have any defense to the original notes or to the renewal notes, including those on which the action is brought. The only theory on which it is claimed that the plaintiff is chargeable with notice of any such defense is on account of the relationship between the plaintiff and the payee. All of the testimony and evidence in the case that was competent as against the plaintiff is to the effect that its representatives, who were taking part in the management of the affairs of the payee, had no notice or knowledge of any of the material facts on which the defendant predicates his defense. The only claim is that the plaintiff's representatives were in a position to acquire knowledge of these facts and that it was their duty to inquire, or that it may be inferred that Horowitz communicated to the finance committee of the payee his interview and understanding with the defendant. But such an inference would be unwarranted in view of the fact that the testimony of Horowitz and of all the plaintiff's representatives who were connected with the payee is to the contrary, and it is the only evidence in the case on the subject. The notice or knowledge acquired by an agent which is imputable to his

principal is limited to notice to or knowledge acquired by him while acting for his principal, or which, if acquired while representing another principal, is in his mind when so acting and when the agent has no private purpose of his own to influence him in refraining from making disclosure to his principal or from acting for the protection of his principal with respect thereto. (*Constant* v. *University of Rochester,* 111 N. Y. 604; *McCutcheon* v. *Dittman,* 164 id. 355; *Comey* v. *Harris, No. 1,* 133 App. Div. 686; affd., 200 N. Y. 534; *Cragie* v. *Hadley,* 99 id. 131; *Holden* v. *New York & Erie Bank,* 72 id. 286; *Crooks* v. *People's Nat. Bank,* 72 App. Div. 331; *New York Assets Realization Co.* v. *Pforzheimer,* 158 id. 700; *Republic Life Ins. Co.* v. *Hudson Trust Co.,* 130 id. 618; affd., 198 N. Y. 590; *Casco Nat. Bank* v. *Clark,* 139 id. 307; *Logan* v. *Fidelity-Phenix Fire Ins. Co.,* 161 App. Div. 404; affd., 220 N. Y. 688.) It does not appear that the plaintiff was under any obligation to discount any or all the notes the payee might desire to have discounted, or to discount the notes of the defendant. It was, through representatives, exercising a financial supervision over the business of the payee to protect it with respect to credit it had extended or might extend to the payee. In other words, it was exercising this supervision for its own protection only, and not for the benefit of the defendant or others dealing with the payee, and it appears that discounts were obtained by the payee from other banking institutions from time to time. The payee, in making and performing contracts, was acting for itself, and not as agent of the plaintiff, which through its representatives exercised such restraint and control over the business of the payee as was deemed necessary for its own protection. Therefore, I think the plaintiff was not even chargeable with *all* notice and knowledge of the payee's business as the same was from time to time transacted, but only such as bore upon any credit which the payee might apply to it for. I agree with the learned trial court that the representatives of the plaintiff had notice and knowledge that this contract had been made by the payee and that the work was being performed by it and that notes were being given by the defendant to the payee under the contract long prior to the time when, according to the testimony of some of them given on the trial, they first acquired knowledge thereof; but that has no material

bearing on the points upon which the decision of the issues depends. The plaintiff is not chargeable with knowledge of the interview between the president of the payee and Horowitz. Knowledge of any agreement made by Horowitz in procuring the renewal notes would of course be chargeable to the payee, which was his principal, but there is no evidence that he communicated the facts to the finance committee of the payee, on which the plaintiff had representation, or to any of its representatives. There is merely his statement to defendant that he did; but he did not represent the plaintiff, and his admissions or declarations are not binding upon it, and all the testimony in the case shows that he did not so communicate it to the finance committee, and there is no evidence; competent as against the plaintiff, that he did. If the plaintiff, in the circumstances, were chargeable with knowledge of all the records of the payee, notice of this verbal agreement between Horowitz and its president could not be imputed to it, for that agreement was in no manner made a matter of record. The plaintiff's representatives on the finance committee and on the auditing committee of the payee had knowledge of this contract; and doubtless, through them, notice that the notes were given with respect to the contract work was imputable to the plaintiff; but upon no theory of the evidence was notice or knowledge that the defendant claimed or had or reserved any defense to these notes, in whole or in part, brought home to any of the plaintiff's representatives in the management of the affairs of the payee; and, therefore, there is no basis for imputing such notice or knowledge to Stanley, who, as treasurer of the plaintiff, authorized the discount of these notes by it, or for charging the plaintiff with notice or knowledge of the conversations between the defendant and Horowitz with respect to the giving of the renewal notes, or any of the notes of which they were renewals. There is no evidence of notice or knowledge to the plaintiff's representatives, in the management of the affairs of the payee, of any of the correspondence or interviews showing or tending to show that the defendant claimed to have a defense in whole or in part to any of the notes given to the payee, or a claim for a deduction of any amount from the vouchers purporting to represent the cost of the work plus the payee's commissions.

The record evidence with respect thereto was kept by Horowitz, personally, and was not seen by or known to or available to the plaintiff's representatives; but if they would have been entitled to see it, had they insisted on seeing it, I think that it is quite clear that the plaintiff is only chargeable with such notice and knowledge as its representatives actually had. The plaintiff's representatives may have been negligent with respect to the performance of their duty toward it in supervising the affairs of the payee; but the plaintiff owed no duty to the defendant; and its representatives in the management of the payee were under no obligation to the defendant to investigate or inquire with respect to his interviews or negotiations or correspondence with Horowitz. The defendant acquired no right under the agreement between the plaintiff and the payee with respect to supervision or financial control. That agreement the plaintiff made solely for its own protection. It had the same right as any one else to discount these notes, and owed the defendant no duty of inquiry with respect thereto. The uncontroverted evidence shows that it had no notice or knowledge that these renewal notes were not what they purported to be, or that they were subject to any adjustment or deduction between the defendant and the payee, or that there was any implied agreement between them that they were not to be negotiated. The plaintiff, through its representatives, is chargeable with knowledge or notice that the notes were renewal notes in connection with the contract work, but not with any verbal arrangement between the defendant and Horowitz with respect thereto. A bank need not be suspicious of its customers, and may assume, when they present papers for discount that they are acting in good faith and within their lawful rights. (*American Ex. Nat. Bank* v. *N. Y. Belting, etc., Co.*, 148 N. Y. 698.) Therefore, the title of the plaintiff is to be tested, not by its diligence or negligence in making inquiries, but by its honesty and good faith, and if it had no actual notice of any infirmity in the notes or defect in the title of the payee, and acted in good faith, even though it acted negligently and omitted to make inquiries which a prudent man would have made, its title is unimpeachable. (*Cheever* v. *Pittsburgh, etc., R. R. Co.*, 150 N. Y. 59; *Carlisle* v. *Norris*, 215 id. 400, 415.) If the defense pleaded be a partial failure

of consideration, the burden was on the defendant, not only of showing the partial failure of consideration, but that plaintiff was not a holder in due course (*Broderick & Bascom Rope Co.* v. *McGrath*, 81 Misc. Rep. 199; *Abrahamson* v. *Steele*, 176 App. Div. 865; *Greenhall* v. *Davis*, 190 id. 632; Neg. Inst. Law, §§ 54, 91, 94–97); and that he failed to do. The defendant, being a capable, experienced lawyer, and knowing that the payee had negotiated his former notes, must have known that it would likely or, at least, that it might, negotiate the notes in question. He could have protected himself by not giving negotiable notes, or by exacting an agreement that the notes were not to become obligations until the matters in difference were adjusted, and then only to the extent of the balance found to be due and owing by him. The payee was financially responsible, and it is perfectly evident that he gave all the notes intending that they should be negotiable instruments, and if negotiated that he would look to the payee to take them up if the matters of difference between them were not adjusted in the interim. The fair and reasonable construction of his testimony is, I think, that in giving the notes he reserved his claims against the payee. If he had not so reserved them, it might have been claimed that he had waived them. That, in my opinion, is all that he intended to guard against. He could have taken up the notes at maturity when he found that they had been negotiated, and could then have brought action against the payee for the difference between what he had paid for the work and the amount with which he should have been charged therefor. He knew that the payee insisted upon having the notes to reimburse it for its disbursements under the contract, and he knew that the only manner in which it could obtain reimbursement by the notes was by discounting them pending the adjustment of his claims for reductions in the charges for the work. This construction of the defendant's testimony brings the case within the authority of *Pratt & Whitney Co.* v. *Pneumatic Tool Co.* (*supra*), and also within the authority of *Tradesmen's Nat. Bank* v. *Curtis* (167 N. Y. 194), where a time draft for coal to be delivered was accepted on the agreement of the drawer to deliver the coal before the draft became payable, and to take up the draft if the coal should not be so delivered. The plaintiff, with full

knowledge of the agreement, discounted the draft without knowledge that the drawer had failed to deliver the coal. It was held that the plaintiff could recover, and that the drawer's promise to deliver the coal was a sufficient consideration for the draft, even though he failed to perform the agreement, and that the prior discount by the drawer of like drafts which was known to the acceptor was sufficient to show that he knew that it might be negotiated. To the same effect is *Davis* v. *McCready* (17 N. Y. 230), where an accepted time draft for work to be performed, discounted by plaintiff before maturity with knowledge that it was given under an executory contract for work to be performed, but without knowledge of a breach of the contract, was held enforcible; and it was also held that the plaintiff was under no obligation to inquire with respect to the performance of the work, even though such inquiry would have disclosed that the contract had been breached before the draft was discounted, and that the acceptor must be deemed to have relied on the agreement for performance for his indemnity.

I deem it very doubtful whether the judgment could be sustained on the findings as made; but I think several findings are based on an erroneous construction of the testimony of the defendant. I am of opinion, therefore, that the judgment should be reversed, with costs to the appellant, and the findings of fact and conclusions of law inconsistent with these views should be reversed, and that the findings with respect to the cost of the performance of the contract work should be reversed as immaterial, and findings and conclusions in accordance herewith made, and judgment awarded in favor of the plaintiff for the entire amount of the notes, together with interest thereon, and costs.

Judgment affirmed, with costs.